Opinion delivered June 9, 1886.

[No. 3669.]

## Lem Doss v. The State.

1. THEFT—ASPORTATION of the stolen goods is not, in this State, a necessary element of the crime of theft. The accused, in this case, pointed out to the prosecuting witness a certain cow and calf on the range, claimed falsely that he owned them, and sold them to the witness. *Held*, sufficient to show such a fraudulent "taking" as is meant by the statute defining theft. See the opinion *in extenso* on the question.

2. SAME—CASE OVERRULED —To the extent that it holds it necessary, in order to constitute a fraudulent taking that the stolen property must have passed into the actual, manual possession of the thief, the case of Lott v. The State, 20 Texas Court of Appeals, 230, is overruled.

3. CONTINUANCE.—NEW TRIAL is properly refused when requested because of the refusal of a continuance, if, when considered in the light of the evidence adduced upon the trial, the absent testimony is not probably true.

4. PRACTICE—EVIDENCE.—Conflicts between the testimony for the State and the defendant must be solved by the jury, and not by the court.

APPEAL from the District Court of Milam. Tried below before the Hon. W. E. Collard.

The conviction was for the theft of a cow and calf, the property of Hugh Tabor, in Milam county, Texas, on the fifteenth day of April, 1881. A term of two years in the penitentiary was the penalty assessed against the appellant.

Hugh Tabor was the first witness for the State. He testified that he lived in Burleson county. He owned cattle in 1881, some of which ran in Milam county. Witness lost a pale red cow, three years old, in the spring of 1881. That animal ranged in Milam county. She had a calf in the spring of 1881. Witness found his cow in the possession of a negro named Bob Hardy, in Milam county, Texas, in July or August 1881. Hardy surrendered her without protest. The animal was in witness's brand—HT,—and his mark, a crop off the right and two splits in the left ear. Tom Lovelace told witness where to find his cow.

Bob Hardy, a witness for the State, identified the defendant as a man whom he had seen prior to this trial. He came to witness's house one evening in the summer of 1881, inquiring for cattle. He said that his name was Lem Doss, and that he owned a ranche at the head of the creek. Witness remarked that he wanted to buy a cow and calf, and defendant said that he would sell such animals to the witness. Witness agreed to buy a cow and calf from him for twelve dollars and a half. Witness was to pay him seven dollars in cash, and the balance in the fall. Defendant left the witness's house about sun down, saying that he would return on the next morning, and show witness the cow and calf. He came back early on the morrow, and went with witness and his son to look for the cow and calf. In an open place in the woods, near the house of William Lovelace, they found a red three year old cow with a young calf, which defendant said was the cow he proposed to sell the witness. The cow was pointed out by defendant, and the witness crossed her out from the other cattle, rode around her and examined her. Witness paid the defendant six dollars, having advanced him one dollar en route, and defendant told witness to take the animals, and that he would execute his bill of sale when witness made the deferred payment in the fall. He then told witness to stay there until he could look around a little for a better cow to give witness in the stead of the one bargained for. Defendant then loped off and witness did not see him until after his arrest. Other cattle were near the animal in question at the time of this transaction. She was crossed out from the other

cattle, but was not driven away from where she was while the defendant was there. Defendant claimed the cow as his, and sold her to witness as his. This transaction occurred near William Lovelace's, about six miles distant from witness's house. The witness did not know exactly how long he had possession of the cow before she was claimed by Mr. Tabor, but from one to three months, and perhaps longer. Witness said, before he saw the defendant in jail, during the preceding fall, that he did not know whether or not he would recognize the man who sold him the cow. He, however, knew defendant to be the man who sold him the cow, as soon as the sheriff brought him out of jail. Witness ate breakfast at defendant's camp during the fall preceding the trial. He did not then tell Thorp that defendant did not sell him the cow. He refused to talk to Thorp about the matter. When he sold the witness the cow, the defendant had beard, and looked as he does now.

This witness testified, also, that en route to look for the cow and calf, he, his son, and defendant, passed near the town of Fraimville. Before reaching that point, defendant said that he was out of money and tobacco, and asked witness to advance him one dollar, for the purpose of procuring tobacco in Fraimville. Witness did so, and defendant left him and his son and went through Fraimville. He presently joined the witness and his son at the forks of the road, beyond Fraimville, where the latter awaited him.

Mose Hardy, the son of the last witness, testifying for the State, corroborated the testimony of his father, except that he denied that defendant asked for, or got, a dollar from his father, before reaching Fraimville, or that the defendant separated from his father and himself, and went through Fraimville for tobacco, or any thing else. Defendant rode with witness and his father from home, past, but not through, Fraimville, to the place where the cow and calf were found, and received the money, in seven silver dollars.

William Lovelace testified, for the State, that he knew the defendant well, and saw him twice in July, 1881. On the first of those occasions defendant came to the witness's house, described the cow and calf mentioned in this indictment, and asked if witness knew who owned them. Shortly afterwards, witness and the Misses Goodrum, met the defendant and Frank Renfro near witness's house. About a week after he inquired of witness about the cow and calf, Bob and Mose Hardy drove the cow up

to witness's house. This was late in July, 1881. Witness made a memorandum of the mark and brand of the cow, because Bob Hardy told him that he got her from defendant. About a month later Mr. Tabor appeared, proved the cow, and took her away. The State closed.

Lem Doss, Sr., was the first witness for the defense. He testified that the defendant was his son. He was twenty-four years old, and made witness's house his home until January 6, 1881, when he left Milam county to go to Lavaca county to live. He left with Charles Emswiler, and went to Lavaca county, and, so far as the witness knew, was not again in Milam county until early in the succeeding September, when he came back on a visit. During the time intervening between January and September, 1881, the witness received letters written by defendant from Sweet Home, in Lavaca county. (The defense failing to account legally for the non-production of the said letters, the court excluded further evidence respecting them.) Defendant had changed materially, in appearance, since 1881. In 1881 he was an awkward, "gawky," beardless boy. He was now heavier, larger, looked like a man, and wore a beard. Witness, his son, W. B. Doss, and William Thorp, attended the last term of this court, staying in camp, near town. Bob Hardy ate breakfast at witness's camp one morning, and in course of conversation said that he had never seen Lem Doss before or since the cow transaction, and he did not think that he could possibly recognize him. He said, further, that the man from whom he purchased the cow did not, in fact, sell him the cow he took, but another cow, telling him, Hardy, that if he did not find the cow he sold, then he, Hardy, could take the red cow and calf, which the said man pointed out and claimed. That man, he said, went off to look for the other cow, but did not come back, and he accordingly took the cow in question. Hardy made these statements to Thorp. Witness did not know Hardy until Thorp told him who he was.

James Harper testified, for the defense, that he lived in Lavaca county, Texas, in 1881, and in January of that year he made the defendant's acquaintance in Lavaca county. From January until April 29, 1881, when witness left Lavaca county, the defendant lived with Doctor Boyce, at Sweet Home.

J. W. Lee, for the defense, produced an envelope, post marked, in writing, "Sweet Home, Lavaca county, Texas, May 27, 1881," in which, he testified, he received a letter from the defendant.

The said envelope was very old, was torn in to two pieces, contained two addresses, and bore the stamp of "Schulenberg."

W. B. Doss, the brother of the defendant, testified, in his behalf, that defendant left his father's home on the first day of January, 1881, with Charles Emswiler to go to Lavaca county to live, and did not visit Milam county again until between the first and the middle of September of the same year. He was beardless and very boyish in appearance in 1881. He now wore whiskers and looked like a matured man.

William Thorp testified, for the defense, that he had known the defendant for a great many years. Witness did not see defendant after January, 1881, until the fall term of this court in 1884. On this latter occasion, witness did not recognize him as Lem Doss. He had undergone a complete metamorphosis in appearance, and was unchanged only in voice. He had no beard in 1881. In 1884, and on this trial, he wore beard and mustache. Witness saw Bob Hardy, the State's witness, at old man Doss's camp during the fall preceding this trial. Hardy, on that occasion, made the statements imputed to him by the witness Lem Doss, senior.

The motion for new trial raised the questions discussed in the opinion.

*Ford & Ford* and *R. Lyles* filed separate briefs and arguments for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge. It is insisted that if it be admitted that the testimony of the State's witnesses be true, still the evidence would not support the conviction in this case, because it does not show "*a taking*" of the alleged stolen animal by defendant. In other words, that the facts as stated by the witnesses do not show that defendant ever exercised such control over, or had such possession of the animal, as would constitute his acts a *taking* under the statute.

Briefly stated, the facts are that the appellant, some time in the summer, proposed to sell a cow and calf to the witness, Bob Hardy, for twelve dollars and fifty cents—seven dollars in cash, and the balance to be paid in the fall. Defendant and the two Hardys, father and son, went the next morning to look for the cow. They came to an open place or sort of prairie in the woods

and found a red three year old cow, with a calf, which defendant pointed out as the one which he wished to sell. They rode around the cow, and, as the witness expresses it, "crossed her out," and the witness, telling defendant he would take her, paid defendant six dollars, and, he says, defendant "delivered me the cow and calf, and he, defendant, told me to take the cow, and I took her;" he, defendant, promising to make the bill of sale when the rest of the money was paid, in the fall. Defendant then told Hardy and his son to stay there with the cow, and he would look around and see if he could not find another one of his cows, and if he could find a better one he would come back and swap it for the one he had sold witness. Defendant then loped off and was never seen again by witness until just before the trial. After awaiting his return some time, Hardy and his son drove the cow and calf home. At the time and place defendant sold the cow to Hardy, there were other cattle near the cow, a short distance off in the timber; but though the parties rode around the cow, they did not drive her, and for aught that appears, she did not move out of her tracks during the time defendant was present, nor until she was driven off, after he had left, by Hardy and his son.

It is contended most strenuously that such facts do not constitute "a taking" by defendant, under our statute defining theft; that, in so far as he was concerned, the range possession of the owner was never disturbed by him, and that he had not exercised the slightest control over said animals of any kind whatsoever, much less having them in his manual possession, even though but for a single moment. In Madison v. the State, 16 Texas Court of Appeals, 436, where the defendant called up the bunch of hogs out of the field and then sold them to a party who actually took them in to possession under his purchase, this was held to be such a taking as would constitute theft on the part of Madison. Mr. Bishop announces the same doctrine. He says: "When the larceny is of a domestic animal, like a horse, the trespass is sufficient if the animal is ridden, driven or led away. And doubtless the same is true if it is toled away by food, or by the voice, so as to come under the control of the thief.  *  *  * Suppose a horse or a dog (or hog?) to be toled out of possession of the owner by corn, is not this as much a taking and carrying away as the shouldering of a bale of goods would be? I confess I can see no substantial legal difference." (2 Bish. Crim Law, 7 ed., sec. 806.)

In Coombes v. the State, 17 Texas Court of Appeals, 259, it was held that where the circumstances showed an intent to steal, the killing of the cow of another on the range, though the animal had never actually passed into the manual possession of the slayer, is sufficient to show such a taking as will support a conviction for theft of the animal. "Manual possession, actual handling, does not appear to be essential in case of animals, even in common law larceny" (2 Bish. Crim. Law, sec. 813, note 7; Hall v. The State, 44 Texas, 287); and if this is true at common law, where asportation was essential to the crime, *a fortiori* it should be the rule with us, where asportation is not necessary to constitute the offense. (Penal Code, Art. 726.)

In Madison's case, *supra*, quoting from 2 Russell on Crimes, it was said: "But the taking need not be by the very hand of the party accused, so that, if the thief fraudulently procure a person innocent of any felonious intent to take the goods for him (as if he should procure an infant, within the age of discretion, to steal the goods), his offense will be the same as if he had taken the goods himself, and it should be so charged." This same doctrine is most clearly declared in our own statutes, with regard to "principals in crime." Article 77, of the Penal Code, reads: "If any one, by employing a child, or other person who can not be punished, to commit an offense, or by any means, such as poison, etc.,    *    *    *    or by any other indirect means, cause another to receive an injury to his person, or property, the offender, by the use of such indirect means, becomes the principal." A party does not directly, in person, take A.'s horse, but he procures its theft by indirect means; that is, by selling said horse to one B., who is innocent of any knowledge of A.'s fraudulent intent; will it be contended that, under the statute quoted, A. is not a principal in the theft, though he never had manual or actual possession or control of said horse, or, though he was not even present at the time of the taking? We think not.

In the case under consideration, defendant did not *take* the animal himself, but, by selling it to Hardy, upon the pretense that it was his, he did procure Hardy, who was entirely innocent, and who believed defendant was the owner, to buy and take possession of the animal. This was certainly causing another to be deprived of his property by indirect means, and under circumstances which, in contemplation of the statute, would make him a principal in the theft.

Mr. Bishop says: "One plain proposition is, that there can be

no crime without a principal. There may be more principals than one, but there must be at least one. Therefore, a man whose sole will procures a criminal transaction, is principal, whatever physical agencies he employs, and whether he is present or absent when the thing is done." (1 Bish. Crim. Law, 7 ed., sec. 649.) Again, he says: "And because there must always be a principal, one is such who does the criminal thing through an innocent agent, though personally absent." (Id., sec. 651.) "The principle of the common law, *qui facit per alium facit per se,* is of universal application, both in criminal and civil cases." (Id., note to sec. 673.)

If the State's testimony in this case, as we have given it above, be true, then it is simply sufficient to establish against defendant "a fraudulent taking," such as is essential, under our statute, to constitute the crime of theft. The views above expressed in no wise conflict with the decision rendered by this court in Hardeman's case, 12 Texas Court of Appeals, 207, in which case there was no "*taking*" of any character by any one. The case of Lott v. The State, 20 Texas Court of Appeals, 230, states a different doctrine, and that case is hereby overruled.

Only one other question remains to be disposed of, and that is the action of the court in overruling defendant's application for a continuance. The defense in the case was an alibi. Defendant claimed that he would prove by his absent witness, Emswiler, that he was not in Milam county until after the month of July, 1881. In view of the other testimony adduced at the trial, we can not say that the court erred in holding that the proposed evidence would probably be true, even if it had been so testified by Emswiler. Lovelace, a witness for the State, testified that during the month of July, 1881, he saw defendant twice in Milam county, and that at one of the times referred to the defendant asked witness to tell him who owned the identical cow and calf in controversy. Lovelace's testimony as to the time is conclusively, in our opinion, corroborated by the evidence of Tabor and the two Hardys. We may conclude that there is a conflict in the testimony between the witnesses for the State and those for defendant; still, the question of the credibility of these witnesses was one for the jury to determine, and having determined it in favor of the State's witnesses, we can not say that they have decided improperly, nor that the court erred in refusing a new trial on account of the proposed evidence of the absent witness, Emswiler.

We have found no reversible error in this record of conviction, and the judgment is affirmed.

*Affirmed.*