KEEL, J., delivered the opinion of the Court in which ALCALA, RICHARDSON, NEWELL, and WALKER, JJ., joined. YEARY, J., filed a concurring opinion. WALKER, J., filed a concurring opinion in which KELLER, P.J., joined. KEASLER and HERVEY, JJ., concurred.
A jury convicted Appellant of two counts of theft of money between $1,500 and $20,000 and assessed his punishment in each case at the maximum of two years in the state jail and a fine of $10,000. In a split opinion the Fort Worth Court of Appeals reversed both convictions for insufficient evidence. Johnson v. State , 513 S.W.3d 190 (Tex. App.-Fort Worth 2016). We granted the State's petition for discretionary review. We hold that the lower court erred in its application of the standard of review, reverse its judgment and remand the case for that court to address Appellant's remaining points of error.
Legal Sufficiency Standard of Review
To evaluate the legal sufficiency of the evidence an appellate court must view the evidence in the light most favorable to the prosecution and ask whether any rational trier of fact could have found each element of the offense beyond a reasonable doubt. Musacchio v. United States , --- U.S. ----, 136 S.Ct. 709, 715, 193 L.Ed.2d 639 (2016) ; Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; Ramsey v. State , 473 S.W.3d 805, 808 (Tex. Crim. App. 2015). Appellate review "does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " Musacchio , 136 S.Ct. at 715, quoting Jackson , 443 U.S. at 319, 99 S.Ct. 2781. Legally sufficient evidence need not exclude every conceivable alternative to the defendant's guilt, Ramsey , 473 S.W.3d at 811, and the law requires no particular type of evidence. Direct and circumstantial evidence are equally probative, and "circumstantial evidence alone can be sufficient to establish guilt." Hooper v. State , 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).
Background
Appellant ran the Johnson Family Mortuary ("JFM"). JFM was owned by Appellant's wife, Rachel Hardy Johnson ("Hardy"). JFM did not have a crematory and sub-contracted cremations to other providers. Appellant was charged with theft because he accepted payments for cremations that were never performed.
The failures to cremate came to light because JFM was behind on rent. The landlord, suspecting an abandonment of the lease, visited the mortuary and found a number of decomposing bodies inside the *227 building on July 15.[1] The Tarrant County Medical Examiner's Office identified the bodies of six adults and two infants with dates of death ranging from January 2, 2013, to June 30. The medical examiner's office also discovered on the premises eight sets of cremated remains ("cremains") and five empty boxes labeled as if they had once contained cremains.
Count One alleged theft of money from Margaret Francois. She and Appellant entered into an agreement on July 1 for the cremation of Patricia Baptiste. She paid for the cremation on July 7 with a cashier's check for $1,500 made out to JFM. The check was endorsed by Hardy and deposited into JFM's account the next day. Baptiste's decomposing body was among those discovered on July 15.
Count Two alleged an aggregate theft. Several people paid Appellant cash for memorial services for and cremation of Karen Jones; one person paid him cash for memorial services for and cremation of Helen Jones; and one person paid him cash for memorial services for and cremation of Titus Harrison. Although Appellant fulfilled his promises to hold their memorial services, he did not cremate the dead, and their badly decomposing bodies were among those found inside JFM on July 15.
The court of appeals held the evidence was insufficient as to both counts to show Appellant's intent to deprive at the time of payment. As for Count 1, it also held the evidence was insufficient to show appropriation.
Intent to Deprive
Theft is the unlawful appropriation of property without the effective consent of the owner with the intent to deprive the owner of property. TEX. PENAL CODE § 31.03(a). Consent is not effective if induced by deception. TEX. PENAL CODE § 31.01(3)(A). "Deception" in the context of this case means
promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.
Tex. Penal Code § 31.01(1)(E). In a theft case arising from a contract, the State must prove that the accused intended to deprive the owner of the property when it was taken. Taylor v. State , 450 S.W.3d 528, 536 (Tex. Crim. App. 2014), quoting Wirth v. State , 361 S.W.3d 694, 697 (Tex. Crim. App. 2012). Intent can be demonstrated by proof that the accused engaged in other similar, recent transactions. See TEX. PENAL CODE § 31.03(c)(1).
Count One
In holding the evidence insufficient to show Appellant's intent to deprive Francois of $1,500 when he accepted her check for the cremation of Baptiste, the majority below observed that the payment was made "only eight days" before Baptiste's body was discovered. Johnson , 513 S.W.3d at 199. It failed, however, to consider that by the time Francois paid Appellant it was impossible for him to carry out Baptiste's cremation because JFM did not have a funeral director in charge ("FDIC").
According to the testimony, a funeral home cannot conduct business without an FDIC. The FDIC is responsible for, among other things, filing reports of death and securing death certificates. TEX. OCC. CODE § 651.403 ;
*228 TEX. HEALTH & SAFETY CODE § 193.002. Death certificates cannot be had without an FDIC, and cremations cannot be performed without death certificates. Death records are created and maintained via the Texas Electronic Registration system ("TER").
In early 2014 Appellant hired Michael Pierce as JFM's FDIC. Hardy created Pierce's password for the TER. According to Pierce's testimony, JFM used his license without his permission for services that he did not oversee. Pierce tried to withdraw as JFM's FDIC in May and officially succeeded in doing so on July 1. On the same day, someone from JFM tried and failed to secure a death certificate for Baptiste using Pierce's license. Appellant and Hardy had both been instructed on the use of the TER. Since the evidence showed that Appellant ran JFM's day-to-day operations in 2014, it is reasonable to infer that he made the futile effort on July 1 to obtain Baptiste's death certificate. Thus, when Francois gave Appellant the cashier's check on July 7, a rational jury could conclude that Appellant knew that he would not carry out Baptiste's cremation.
The court of appeals majority, however, regarded the failed effort to secure a death certificate as a sign that Appellant intended to perform the cremation. Johnson , 513 S.W.3d at 201. It did not seem to consider that it was impossible at that point for JFM to carry out a cremation, and it substituted its judgment for that of the jury. It also failed to weigh the evidence of Appellant's other recent, similar transactions in which he deceived cremation customers. We address that evidence below in our discussion of Count Two.
Count Two
With respect to Count Two, the court of appeals majority noted that Appellant performed part of each contract: memorial services and wakes for Karen Jones and Helen Jones and a funeral service for Harrison. Id. at 201. It reasoned that the evidence showed an intent to delay cremation but not necessarily an intent not to cremate at the time he was paid. Id. "The record reflects a history of problems with necessary paperwork, and long delays in completing mortuary services. But there is no evidence of an intent never to perform the services." Id. To reach that conclusion, the majority below had to ignore the evidence of Appellant's deceptive practices in his dealings with the complainants in Count 2.
For example, Helen Jones's son Frederick paid for her cremation in April, but her body was one of those found decomposing inside JFM on July 15. In the intervening months when Frederick asked about his mother's remains, Appellant repeatedly put him off with the excuse that he was waiting for the death certificate. The dishonesty of that excuse was revealed by the TER which showed no effort to obtain a death certificate for Helen Jones. Count Two's other complainants received the wrong cremains. Appellant gave Karen Jones' daughter the cremains of Sandra Baldwin; and he gave Jabarei Clark's ashes to the mother of Titus Harrison. The court of appeals acknowledged Appellant's deception of Count Two's complainants in its summary of the evidence, id. at 200, but did not factor it into its evaluation of the sufficiency of the evidence. Id. at 201.
The lower court also ignored evidence of two extraneous instances of deception by Appellant, omitting their details entirely from its opinion. In one instance Appellant delivered unknown ashes to the family of Larry Ray Davis in January and represented them as Davis's. In fact Davis was not cremated until February, and his cremains were found inside JFM on July 15. Similarly, Appellant gave Opal Anderson's ashes to Aundrea Jones's daughter, and Aundrea's remains were never found.
*229 Appellant's deceptive practices were circumstantially corroborated by other evidence discovered at JFM on July 15, namely the five empty cremains boxes, the one almost-empty cremains box, and the unidentified box of cremains. The court of appeals' only mention of this physical evidence was a reference to "ashes" found by authorities on July 15. Johnson , 513 S.W.3d at 193. This evidence, in combination with Appellant's lies to his customers, suggested that he was engaged in a kind of Ponzi scheme in which he delivered earlier ashes for later bodies.
The lower court's opinion also overlooked the fact that cremains are not supposed to be fungible. The complainants did not pay simply for cremation but for the return of their respective loved ones' cremains. Given Appellant's repeated misrepresentations about whose ashes he was delivering to his customers, a rational fact finder could conclude that he knew at the time of payment that, even if he did eventually cremate a given body, the resulting cremains would not end up in the right hands, an aspect of these theft cases that the lower court did not consider.
Viewing the evidence in the light most favorable to the convictions, a rational jury could conclude that Appellant accepted payment for cremations that he knew he would not perform in both counts of the indictment. The lower court erred in its evaluation of the sufficiency of the evidence by disregarding or re-weighing incriminating evidence.
Appropriation
The majority opinion below also held that the evidence was insufficient to show that Appellant appropriated money as alleged in Count One of the indictment. Id. at 199. The court reasoned that because Appellant did not own JFM and was not a signatory on its bank account his possession of Francois's check did not prove that he exercised control over the money it represented. Id. "When Appellant possessed the check, he did not possess the $1,500. He 'was in possession of a piece of paper worth, at the most, pennies.' " Id. , quoting Heimlich v. State , 988 S.W.2d 382, 385 (Tex. App.- Houston [14th Dist.] 1999, pet. ref'd). This is a dubious assertion because one need not be a signatory on a bank account in order to deposit a check into it. But regardless of the assertion's merits, it is irrelevant here because Francois's check was deposited and spent. Compare Orr v. State , 836 S.W.2d 315, 319 (Tex. App.-Austin 1992, no pet.) (theft of money not proven for lack of evidence that money orders were negotiated).
The court of appeals rejected the State's argument that Appellant was guilty as a party with his wife because it found no evidence that Hardy intended not to cremate Baptiste or knew that Baptiste would not be cremated when Francois paid for the service. Johnson , 513 S.W.3d at 197. The court erred to acquit Appellant for lack of evidence about Hardy's intent or knowledge.
The law of parties authorizes conviction for the collective conduct of two or more people. "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." Section 7.01(a).[2] Under Section 7.02(a)(2) a person is criminally responsible for the conduct of another if he intends commission of the *230 offense and does something to help the other person to commit it:
A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.
Section 7.02(a)(2) requires evidence that the defendant intended commission of the crime and did something to help the other to commit it; it does not require evidence of the other person's intent. The lower court's requirement that the other intend the commission of the crime finds no support in the text of Section 7.02(a)(2) and ignores Section 7.01(a)'s "or by both" collective-conduct basis for criminal responsibility.
The lower court's holding also runs afoul of Section 7.03(2) which stipulates that it is no defense to party liability that the other person was acquitted of the offense. If an outright acquittal of Hardy would have offered Appellant no defense to party liability, then insufficient evidence of her intent in Appellant's trial should offer him no defense either, and the court of appeals erred to acquit him on that basis.
The lower court's reliance on Heimlich is also misplaced. Heimlich held that the defendant never appropriated the funds from a check deposited into his account because the complainant managed to place a freeze on the defendant's account before the defendant accessed the funds. 988 S.W.2d at 385. In this case the check was deposited and the money was spent.
The majority below also seemed to hold that the evidence was insufficient because the obligation to fulfill the contract with Francois belonged to JFM and not Appellant, its employee. Johnson , 513 S.W.3d at 199. It cited Heimlich 's hypothetical situation involving a law firm, but that does not apply here because Appellant's guilt was established by legally sufficient evidence; he accepted payment for a cremation he knew he would not perform; he gave the check to Hardy; and Hardy deposited it. Appellant's intent and efforts to assist the commission of the crime plus Hardy's appropriation of the check equal theft regardless of his status as an employee of JFM.
Conclusion
The evidence was legally sufficient to support Appellant's two theft convictions. We reverse the judgment of the court of appeals and remand for consideration of Appellant's remaining points of error.
CONCURRING OPINION
Yeary, J., filed a concurring opinion.
Today the Court reverses the opinion of the court of appeals and remands the cause for further proceedings. For the reasons expressed at length herein, I concur in that result. But I cannot join the Court's opinion because of its construction of Section 7.02(a)(2) of the Penal Code. TEX. PENAL CODE § 7.02(a)(2). As I understand its opinion, the Court holds that Appellant may be found criminally responsible for the conduct of his wife under this provision even though his wife lacked any intent to commit theft. Majority Opinion at ---- - ----. This strikes me as a mistake.
The Court rejects the proposition that Section 7.02(a)(2)"require[s] evidence of the other person's intent" because such a requirement "finds no support in the text" of that provision. Id. at ----. I disagree. There is ample language in Chapter 7 of the Penal Code, including Section 7.02(a)(2), to indicate that a person is not ordinarily susceptible to being found vicariously responsible for the criminal conduct of another unless and until that other person *231 has actually committed an offense. And an offense is not complete unless it includes any statutorily required element of culpable intent.
Section 7.01(a) of the Texas Penal Code provides that a person is criminally responsible as a "party to an offense if the offense is committed by his own conduct" or "by the conduct of another for which he is criminally responsible[.]" TEX. PENAL CODE § 7.01(a) (emphasis added). It further provides that a person who is not a primary actor may nevertheless be found guilty as a "party" if he is "criminally responsible for an offense committed by the conduct of another[.]" TEX. PENAL CODE § 7.02(a) (emphasis added). One such theory of vicarious criminal responsibility is that the person "solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense [.]" TEX. PENAL CODE § 7.02(a)(2) (emphasis added). Moreover, when the 1974 Penal Code was promulgated, it was not intended to "substantially change the prior complicity test" codified in earlier penal codes. TEX. PENAL CODE § 7.02 practice cmt. (West 1974). Previous penal codes made it abundantly clear that a full-blown offense had to actually be committed, by somebody , before anyone -whether primary actor or abettor-could be convicted. See V.A.C.P. art. 65 (1925) ("All persons are principals who are guilty of acting together in the commission of an offense ."); art. 66 (providing for the conviction of one who encourages "an offense" that is "actually committed by one or more persons"); art. 67 (providing for the conviction of one who aids in "the commission of an offense"); art. 69 (providing for the conviction of one who "advises or agrees to the commission of an offense and who is present when the same is committed ") (all emphasis added).
Thus, contrary to the Court's assertion today, the language of " Section 7.01 provides that one may be charged as a party to the commission of an offense if he is criminally responsible for the conduct of another who perpetrates the offense ." TEX. PENAL CODE § 7.01 practice cmt. (West 1974) (emphasis added). And unless she had the requisite culpable mental state, Appellant's wife cannot have committed the theft offense in this case.[1] That being so, Appellant cannot be held criminally responsible for any non-culpable acquisitive conduct on her part-at least not under Section 7.02(a)(2). To the extent that the Court finds the evidence legally sufficient to support Appellant's guilt as a party under that provision, I cannot join its opinion today.
On the other hand, the Court may legitimately reach the same result by applying Section 7.02(a)(1). See TEX. PENAL CODE § 7.02(a)(1) (specifically providing for vicarious criminal responsibility for a person who, with requisite intent, causes "an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense"). I write further to explain why, on that basis, I agree with the Court's ultimate conclusion that the evidence is legally sufficient.
I. BACKGROUND
A. Facts
Appellant was convicted of two counts of theft of money in an amount between $1,500 and $20,000, a state jail felony. TEX. PENAL CODE § 31.03(e)(5). The Second Court of Appeals held the evidence to be legally insufficient to support Appellant's conviction on both counts and entered a judgment of acquittal.
*232 Johnson v. State , 513 S.W.3d 190, 201 (Tex. App.-Fort Worth 2016).
Evidence at his trial demonstrated that Appellant and his spouse, Rachel Hardy, operated the Johnson Family Mortuary ("mortuary" or "funeral home"). Appellant handled the mortuary's day-to-day operations, including, among other things, speaking with clients, negotiating contracts, delegating duties among the various employees, and transporting remains.[2] The mortuary itself, however, was owned by Hardy, and she primarily managed its financial affairs because she was the sole person authorized on the mortuary's bank account. For years, the mortuary's funds were commingled with the couple's personal funds and funds from Hardy's separate tax business. Bill-paying was sporadic and, beginning in 2014, the mortuary's rent payments were either late or never received. In addition, the mortuary retained bodies for months before cremating them, leaving the mortuary with a negative reputation within the industry.[3]
In Texas, every funeral home is required to have a registered Funeral Director in Charge ("FDIC") who is responsible for managing day-to-day operations and obtaining death certificates and other legal documents that the Texas Electronic Registration system ("TER") requires for a cremation.[4] In February of 2014, Appellant hired Michael Pierce to act as the mortuary's FDIC. Pierce attended only one funeral service and, in April of 2014, became suspicious that the mortuary had been performing funeral services without his supervision in violation of state regulations. Pierce formally submitted his resignation to the Texas Funeral Service Commission in May of 2014, requesting that the commission remove him from the TER.[5] However, somebody with the mortuary repeatedly used Pierce's number and password for the TER system, even after Pierce had resigned his position, to apply for the necessary legal documents required for a cremation.[6]
On July 15, 2014, after the mortuary repeatedly failed to make timely rent payments, Jim Labenz, the landlord, visited the mortuary to determine whether the premises had been abandoned. Labenz and his partners were struck by a foul odor upon arrival and proceeded to the back of the funeral home to inspect the premises further. They discovered several bodies, some of which had not been embalmed or refrigerated, in various stages of decomposition. In total, they found eight bodies-six *233 adults and two infants-inside the mortuary. The first body, later identified as Chewe Mwangilwa, was fully embalmed and laid out in the viewing room with the proper paperwork required to be transported outside the country. The second body, identified as Patricia Baptiste, was found in the embalming room but was not fully embalmed. Three more bodies were discovered in body bags in the mortuary's garage. They were identified as the bodies of Karen Jones, Helen Jones, and Debra Whitney. The sixth body, identified as that of Victoria Vasquez, was found in an open casket, dressed in preparation for a funeral service, but otherwise decomposing. The two infants' remains were found in a cremation casket and a plastic bin, respectively. Both had decomposed and liquified. They were identified by the medical examiner's office to be the remains of Malaysia Biscoe and Titus Harrison. In addition to the bodies, several sets of ashes were discovered and sent off to the medical examiner's office for identification.
The State charged Appellant in a two-count indictment with theft of money in an amount of $1,500 or more, but less than $20,000, based upon the mortuary's handling of four of the bodies. See TEX. PENAL CODE § 31.03(e)(5).[7] Count One charged Appellant with theft of money from Margaret Francois, who paid $1,500 for the cremation of Patricia Baptiste. On July 1, 2014 Francois met with Appellant to have Baptiste's body cremated and the ashes sent to Baltimore, Maryland. After the meeting, someone at the mortuary attempted to enter a report of death through the TER, using Pierce's FDIC number. This attempt proved unsuccessful when the system rejected Pierce's number. One week later, on July 7, 2014,[8] Francois tendered to Appellant a cashier's check for $1,500, made out to the Johnson Family Mortuary, with the words "Patricia Baptiste cremation" written on the memo line. The check was deposited into the mortuary's business account that day by Hardy. Baptiste's remains, however, were never cremated, and Labenz found her body in the mortuary's embalming room. Appellant later told authorities that Baptiste's remains were not cremated because he was waiting for an additional payment from Francois so that her brother could view the cremation.[9]
Count Two charged Appellant with aggregated theft of money, pursuant to the same scheme or continuing course of conduct, from eight different complainants: Michelle Jones-McElhanon, Tony Jones, Connie Mabry, Little Texas,[10] Eric Jones, and Lana Adewusi, who all contributed a total of $3,025 for the full funeral service arrangements of Karen Jones; Desiree Williams, who paid $300 for the funeral and cremation of the infant Titus Harrison;
*234 and Fred Jones, who paid $2,800 for the wake, funeral, and cremation of Helen Jones. TEX. PEN. CODE § 31.09. The wake and funeral services were conducted for both Karen Jones and Helen Jones, whereas only a funeral service was held for Titus Harrison. However, none of these bodies was cremated.
B. Procedural History
A jury convicted Appellant on both theft counts and assessed punishment at two years in a state jail facility, in addition to a $10,000 fine, on each count. Among his other complaints on appeal, Appellant challenged the sufficiency of the evidence to prove each count. In a 2-1 decision, the court of appeals held the evidence insufficient to support both counts and acquitted Appellant without reaching the merits of his other claims. Johnson , 513 S.W.3d at 201. The State petitioned this Court for discretionary review, arguing that the court of appeals failed to conduct a proper sufficiency analysis in that it failed to measure the evidence against a hypothetically correct jury charge and failed to view the evidence in the light most favorable to the verdict.
II. STANDARD OF REVIEW
In a legal sufficiency analysis, the relevant inquiry on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (citing Johnson v. Louisiana , 406 U.S. 356, 362, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) ). We held in Malik v. State that the evidence is to be measured against "the elements of the offense as defined by the hypothetically correct jury charge for the case." 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge, we explained, "is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." Id.
Section 31.03 of the Texas Penal Code reads: "A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of [the] property." TEX. PENAL CODE § 31.03(a). Appropriate means "to acquire or otherwise exercise control over property ...." TEX. PENAL CODE § 31.01(4)(B). "An appropriation of property is considered unlawful if it is without the owner's effective consent" and consent is ineffective if it is induced by deception or coercion. TEX. PENAL CODE §§ 31.03(b)(1), 31.01(3). The Code goes on to define "deception" to mean, among other things, "promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed." TEX. PENAL CODE § 31.01(1)(E). However, the State must produce evidence beyond a simple failure to perform the promise in issue to prove the intent of the promisor at the time the promise was made. See id. ("[F]ailure to perform the promise in issue without other evidence ... is not sufficient[.]"). Finally, the owner need not be deprived of the property permanently; a deprivation occurs when the property is withheld "for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." TEX. PENAL CODE § 31.01(2)(A).
III. ANALYSIS
A. Count One
1. Theft of Money versus Theft of a Check
Count One alleged that Appellant "unlawfully appropriat[ed], by acquiring or *235 otherwise exercising control over property, to wit: money ... with intent to deprive the owner, Margaret Francois, of the property." The court of appeals believed the allegation of "money" was fatal to the State's case because it concluded that, at trial, the State produced evidence only that a check was appropriated, not cash money. Johnson , 513 S.W.3d at 196, 199. Relying upon Orr v. State , 836 S.W.2d 315 (Tex. App.-Austin 1992), the court of appeals explained that the State had to produce evidence that Appellant endorsed, cashed, or otherwise negotiated the check to convict him for the theft of money. Johnson , 513 S.W.3d at 196, 199. The evidence, according to the court of appeals, failed to show Appellant could have exercised any control over the money because he was not a signatory on the mortuary's bank account and the check was made out to the mortuary instead of Appellant. Id. at 199.[11] Because Appellant could not have endorsed the check, the court of appeals explained, it followed that Francois's check held "no significant value except to the funeral home." Id. Instead, the court of appeals concluded, "[w]hen Appellant possessed the check, he did not possess the $1,500[,]" but " 'was in possession of a piece of paper worth, at the most, pennies.' " Id. (quoting Heimlich v. State , 988 S.W.2d 382, 385 (Tex. App.-Houston [14th Dist.] 1999, pet. ref'd) ).
This analysis is supportable, insofar as it goes. In a case involving proof of a stolen check, our jurisprudence has been clear: When the State alleges the theft of money but the evidence produced at trial shows instead that the property was a check, there must be additional evidence that the check was also endorsed, cashed or negotiated. See Lieske v. State , 60 Tex.Crim. 276, 131 S.W. 1126, 1126-27 (1910) (finding a fatal variance between an indictment alleging the unlawful acquisition of United States currency and the evidence when the State produced only a check); Wimer v. State , 120 Tex.Crim. 576, 48 S.W.2d 296, 303 (1932) (distinguishing Lieske and finding no fatal variance because the evidence produced by the State demonstrated that the defendant deposited the check into a personal bank account); Orr , 836 S.W.2d at 317-19 (stating that this Court's jurisprudence "recognize[s] the distinction between proof that a defendant merely obtained a check as opposed to proof that the defendant obtained the check, endorsed it, and cashed or otherwise negotiated it" and reversing a defendant's conviction for theft of "cash money"). Consequently, had Francois's check never been cashed or deposited, on the basis of controlling precedent from this Court, I would agree with the court of appeals that the evidence in Appellant's case would have been insufficient to support a finding that he appropriated "money" as alleged in Count One.[12]
*236 Similarly, I would have agreed that Appellant could not himself have exercised control over the money when the check was deposited because the uncontested evidence showed that he was not a signatory on the mortuary's business account and could not lawfully endorse the check.[13] Nevertheless, consistent with our precedents, Appellant could have been convicted of the theft of money, as alleged in the *237 indictment, if a jury could rationally have found him liable as a party to Hardy's act of depositing the check into the mortuary's business account.
2. Appellant's Liability as a Party Under Section 7.02(a)
The State argued at trial that Appellant was guilty of stealing money by virtue of his having been a party to Hardy's appropriation of money by depositing Francois's check pursuant to Penal Code Section 7.02(a)(2). See TEX. PENAL CODE § 7.02(a)(2) (establishing a rule of party liability where a defendant, with the intent to facilitate an offense, "solicits, encourages, directs, aids, or attempts to aid [another] person to commit the offense"). The jury charge instructed the jury that it could convict Appellant under this theory of party liability. It was the State's theory at trial that, when Hardy deposited the $1,500 and " 'did something with the money,' it [was] proper to infer that the 'something' she did was to appropriate the money ... intending that the body [would] not be cremated." Johnson , 513 S.W.3d at 197. Further, Appellant, acting as an employee of the mortuary, was complicit in the offense because he knew at the time the check was deposited that he would not perform the cremation.
The court of appeals concluded that the evidence was insufficient to support a verdict under Count One of the indictment under this theory, noting that the State failed to produce any evidence demonstrating that Hardy possessed any intention or knowledge that the mortuary would fail to perform Baptiste's cremation as promised. Id. 198-99.[14] Instead, the evidence showed that Hardy had withdrawn herself from the mortuary's daily operations and was not involved with, and did not know of, whatever services Appellant promised Francois that the mortuary would perform when he received the check. Id. at 197-98. Consequently, the court of appeals determined, Appellant could not be found liable under the law of parties because there was no evidence of an offense committed by Hardy for which Appellant could have been found criminally responsible as a party. Id. at 199. Again, the court of appeals' analysis is supportable, insofar as it goes.
Section 7.02(a) of the Penal Code provides multiple theories of criminal responsibility under which a defendant may be found guilty as a party. The court of appeals considered Appellant's criminal responsibility only with respect to Section 7.02(a)(2), which requires evidence of an offense committed by another in conjunction with evidence that the defendant facilitated the commission of the offense. But that is not the only theory of criminal responsibility contained in Section 7.02(a) of the Penal Code. Under Section 7.02(a)(1), a defendant is criminally responsible for an offense if, while "acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense." TEX. PENAL CODE § 7.02(a)(1) (emphasis added). This provision embodies a separate theory of party liability when another person is not shown to be guilty and is thus innocent in law of any offense, but the defendant caused the innocent person to engage in an act that, when combined with the defendant's criminal intent, constitutes an offense.
*238 It is true that Appellant's jury was not explicitly instructed with respect to this specific theory of criminal responsibility. But Malik requires us to measure sufficiency of the evidence against the hypothetically correct jury charge, not the actual charge the jury was given. If party liability was a theory advanced by the State at trial or was in the jury charge, and the State's evidence was sufficient to establish Appellant's guilt as a party under Section 7.02(a)(1), then failing to include that theory of party liability in our sufficiency analysis would unnecessarily restrict the State's theories of liability. Malik , 953 S.W.2d at 240.
Here, the jury charge authorized the jury generally to convict Appellant under the law of parties, instructing the jury that:
All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.
The abstract instructions then set out the vicarious criminal liability theory contained in Section 7.02(a)(2), but not that which is contained in Section 7.02(a)(1). The application paragraph then authorized the jury to convict Appellant as a party under Section 7.02(a)(2), if it found that, "by acting with the intent to promote or assist the commission of the offense, [he] solicited, encouraged, directed or aided Rachel Jelanni Hardy to commit the offense[.]" It did not expressly include the specific language of criminal responsibility as a party described in Section 7.02(a)(1).
Even so, the jury's verdict in this case constituted an implicit finding that Appellant was criminally responsible as a party under Section 7.02(a)(1). Before Appellant could be found criminally responsible as a party under Section 7.02(a)(2), the jury would have been required to find that Hardy committed the offense, and that Appellant purposefully facilitated her commission of it.[15] On the particular facts of this case, a jury that would find Appellant criminally responsible as a party under Section 7.02(a)(2) would also have necessarily found him criminally responsible under Section 7.02(a)(1). The theory of vicarious criminal responsibility described under Section 7.02(a)(1) is essentially subsumed by the theory of vicarious criminal responsibility under Section 7.02(a)(2). The only meaningful difference between the two is simply that, under Section 7.02(a)(1), the jury would not be required to find Hardy herself to be liable for the theft. It would only need to find that Appellant either "cause[d] or aid[ed]" her to commit the culpable act-depositing the check from Francois-while he himself harbored the requisite intent. TEX. PENAL CODE § 7.02(a)(1). A jury verdict that Appellant was criminally responsible as a party under Section 7.02(a)(2) would encompass all of the essential facts necessary to find him criminally responsible as a party under Section 7.02(a)(1). So long as the evidence was sufficient to support such a finding, there is no impediment to our concluding that the evidence is legally sufficient.[16]
*239 I would hold that the evidence in this case should be weighed against a hypothetically correct jury charge that includes the theory of party liability contained in Penal Code Section 7.02(a)(1). Measured against that theory of party liability, I conclude that Appellant could rationally have been found liable as a party under Section 7.02(a)(1) if the evidence demonstrated that: (1) he caused or aided Hardy, an innocent or nonresponsible person, to appropriate the money by depositing Francois's check; (2) he did so while harboring an intent to deprive Francois of the money; and (3) the appropriation was unlawful because it was based on deception, in that Appellant had no intention to-or was at least reasonably certain he would not-perform the services Francois bargained for at the time he accepted her check.
i.) Appropriation . In the Penal Code, "appropriation" means "to acquire or otherwise exercise control over property[.]" TEX. PENAL CODE § 31.01(4)(B). When the property is a check, an appropriation of the underlying money the check represents occurs when the check is endorsed, *240 cashed, or otherwise negotiated. See Lieske , 131 S.W. at 1126-27 ; Wimer , 48 S.W.2d at 303. At trial, the State produced evidence that Francois's check was delivered to Appellant and then endorsed by Hardy and deposited into the mortuary's business account. Evidence also demonstrated that the funds were not spent on anything related to Baptiste's cremation. The State stipulated that Hardy was the sole signatory on the mortuary's business account, and testimony from the bank representative confirmed that only Hardy could withdraw and transfer funds from the account. Because Hardy controlled the account, she exercised control over the money located within the account, which included the $1,500 once Francois's check was deposited. If Hardy was "an innocent or nonresponsible person" in contemplation of Section 7.02(a)(1), then Appellant may be liable to the extent that he "cause[d] or aid[ed]" her act of appropriating the money.
The terms "innocent" and "nonresponsible person" are not defined in the 1974 Penal Code. In construing code provisions, however, we may consider "former statutory provisions[.]" TEX. GOV'T CODE § 311.023(4). Every previous penal code in Texas, beginning in 1857, and culminating with Article 68 of the 1925 Penal Code, has included, without any substantive change, a provision that read:
If any one by employing a child or other person who cannot be punished to commit an offense, or by any means, such as laying poison where it may be taken and with intent that it shall be taken, or by preparing any other means by which a person may injure himself and with intent that such person shall thereby be injured, or by an other indirect means cause another to receive injury to his person or property, the offender by the use of such indirect means becomes a principle.
V.A.P.C. art. 68 (1925) (emphasis added). See also O.C. art. 217 (1857), P.C. art. 77 (1879, 1895, 1911). Although Section 7.02(a)(1) of the 1974 Penal Code does not carry forward this precise language, the practice commentary to Section 7.02 makes clear that it was nonetheless meant to be "a codification and clarification of [former Article 68] regarding complicity in an offense committed by an innocent or non-responsible agent." TEX. PENAL CODE § 7.02(a) practice cmt. (West 1974). Thus, the case law interpreting the language of the former articles enlightens our understanding of what the terms "innocent" and "nonresponsible person" mean as they appear in Section 7.02(a)(1) today.
In Doss v. State , a defendant proposed to sell two cows to a prospective buyer. 2 S.W. 814, 814 (Tex. Ct. App. 1886). The buyer and the defendant walked to an open prairie, where the defendant identified two cows he claimed to own and sold them to the buyer. Id. at 814-15. After the defendant left, the buyer and his son drove the cows from the prairie and onto their property. Id. at 815. Later, it was shown that the cows did not belong to the defendant but were, instead, the property of another person. Id. In affirming the defendant's conviction for theft, the Court explained that, although the defendant did not personally take the cows (the property alleged to have been stolen) from their lawful owner, he nonetheless caused a person, without any knowledge of the defendant's fraudulent intent, to take possession of the animals and permanently deprive the owner of his property. Id. at 815-16. Under what was then Article 77 of the 1879 penal code, a defendant need not have personally appropriated the property; it was enough that he caused any person who did not know it was unlawful to appropriate the property. Id.
*241 Since Doss was decided, this Court, relying on successor provisions in subsequent penal codes, has repeatedly upheld convictions for theft in cases in which the defendant caused another person, unaware of the criminal nature of the acts, to appropriate property belonging to someone other than the defendant. See Houston v. State , 98 Tex.Crim. 280, 265 S.W. 585, 585-86 (1924) (holding that a defendant was properly charged with theft when he purported to sell a bale of cotton that was not his even though it was the buyer who removed it from the cotton yard); Wade v. State , 115 Tex.Crim. 160, 29 S.W.2d 377, 379 (1930) (holding that a defendant is liable for theft if, with a fraudulent purpose, he directs an innocent agent to secure a car on the defendant's behalf). In 1942, this Court declared, with respect to the offense of theft, that "[i]f [a] defendant fraudulently procured a person innocent of any fraudulent intent to take the property for him, it is a taking through an innocent agent, and a taking by an innocent agent is a taking by [the] defendant." Spivey v. State , 144 Tex.Crim. 432, 164 S.W.2d 668, 672 (1942) (citations omitted). Therefore, the terms "innocent" and "nonresponsible person," as those terms are used in Section 7.02(a)(1), include persons who are unaware that their conduct is unlawful.[17]
Thus, under Section 7.02(a)(1), Hardy need not have been aware of any criminal intent on Appellant's part to defraud Francois before Appellant may be held liable for her acquisitive conduct in depositing Francois's check. So long as the evidence shows that Appellant "cause[d] or aid[ed]" Hardy's appropriation of Francois's money by depositing her check, and that Appellant himself "act[ed] with the kind of culpability required for" theft, he may be convicted of stealing Francois's money. TEX. PENAL CODE § 7.02(a)(1). For Appellant to have acted with the kind of culpability required for purposes of assigning party liability under Section 7.02(a)(1), the evidence must also show that he intended to deprive Francois of her money, and that he caused her to relinquish it by deception, promising a performance of services that he never intended to honor, such that the appropriation of her money was "unlawful." In my view, the evidence presented at trial adequately supports both inferences.
ii.) Intent to Deprive . To deprive a person of their property means "to withold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." TEX. PENAL CODE § 31.01(2)(A). It is axiomatic that, in a contractual relationship, one party agrees to give up something of value in exchange for something of value in return. In exchange for Appellant's promise to cremate and deliver Baptiste's remains for burial in Maryland, Francois agreed to pay, and thus allow Appellant to permanently *242 deprive her of, money (specifically, $1,500 in the form of a check). The evidence demonstrates that Appellant and Francois had a meeting of the minds with regard to at least that much. Therefore, the evidence was sufficient to show that Appellant intended to deprive Francois of the money when he received the check on the promise that the mortuary would perform the cremation.
iii.) Unlawfulness of the Appropriation: Appellant's Intent not to Perform . "Theft cases involving unfulfilled contractual obligations present special problems with sufficiency of the evidence." Taylor v. State , 450 S.W.3d 528, 536 (Tex. Crim. App. 2014). To successfully prosecute a defendant for theft in these circumstances, the State must produce evidence that the appropriation of the property was "unlawful" because it was induced by deception. Wirth v. State , 361 S.W.3d 694, 697 (Tex. Crim. App. 2012). On the facts of this case, the relevant statutory definition of "deception" is "promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed ." TEX. PENAL CODE § 31.01(1)(E) (emphasis added). The court of appeals believed that the record failed to show any evidence of an intent on the part of Appellant "not to perform the cremation at the time Appellant accepted the check." Johnson , 513 S.W.3d at 198-99.
I disagree. The evidence produced at trial shows that Francois contacted Appellant on July 1, almost two months after Pierce first submitted his resignation as FDIC to the TER, and the mortuary attempted to enter a report of death for Baptiste that same day, using Pierce's FDIC number. The attempt was unsuccessful because Pierce's information had already been removed from the TER system. Additionally, evidence showed that Appellant completed a course on the TER system and handled the mortuary's day-to-day responsibilities (including those required of an FDIC), which a reasonable jury could conclude meant that Appellant was aware that the TER system rejected the report of death for Baptiste and understood that the remaining cremation services could not be performed until the report of death was entered.[18] Nonetheless, Appellant proceeded to meet with Francois one week later, on July 7, and negotiated the payment for Baptiste's cremation. The evidence further showed that the check was deposited with Hardy's endorsement that same day. As the dissent in the court of appeals explained, "proof of a culpable mental state almost invariably depends upon circumstantial evidence." Johnson , 513 S.W.3d at 202 (citing Montgomery v. State , 198 S.W.3d 67, 87 (Tex. App.-Fort Worth 2006, pet. ref'd) ). The fact that Appellant continued to negotiate with Francois after the TER rejected the report of death for Baptiste, knowing the impact such a rejection has on the funeral process, is sufficient circumstantial evidence for a reasonable jury to conclude beyond a reasonable doubt that Appellant did not intend to cremate Baptiste at the time he accepted Francois's check.
Moreover, incorporating Section 7.02(a)(1) into the hypothetically correct jury charge, and measuring the sufficiency of the evidence with that provision in mind, I conclude that the evidence was sufficient to support Appellant's conviction on Count One. It shows that, "acting with the kind of culpability required" to establish theft, Appellant "cause[d] or aid[ed]" Hardy to appropriate *243 Francois's money by depositing her check. Consequently, I agree that the court of appeals erred by holding the evidence to be insufficient as to Count One of the indictment, and I concur in the Court's judgment to reverse the court of appeals' judgment as to that count.
B. Count Two
In Count Two, the State charged Appellant with aggregated theft, in that he "did then and there unlawfully appropriate, by acquiring or otherwise exercising control over property, to-wit: money ... with intent to deprive the owners ... of the property [which was] obtained pursuant to one scheme or continuing course of conduct."[19] In total, eight complainants were listed in Count Two, relating to Appellant's failure to cremate three bodies: Karen Pearl Jones, Titus Harrison, and Helen Jones. The court of appeals reasoned that the evidence was insufficient to convict Appellant because, "[i]n every situation covered by Count Two, Appellant performed [at least] part of the contract." Id. at 201. "Memorial services and wakes were held for Karen Pearl Jones and Helen Jones.... [and] a funeral service was held for [Titus Harrison]." Id. Therefore, while Appellant's conduct was certainly unconscionable, the court of appeals concluded, "the State failed to prove an intent to perform only part of the services contracted for at the time Appellant received the money ...." Id. (emphasis added).
It is true that the mere failure to perform a contract, standing alone, does not amount to theft under Texas law. See TEX. PENAL CODE § 31.01(1)(E) ("[F]ailure to perform the promise in issue without other evidence ... is insufficient."). However, in Taylor v. State , this Court explained:
[T]he fact that partial or even substantial work has been done on a contract will not invariably negate either the intent to deprive or the deception necessary to establish the unlawfulness of the initial appropriation. A [defendant] still may be convicted of theft under circumstances ... in which a rational fact-finder could readily conclude that he never intended, even at the outset, to perform fully or satisfactorily on the contract, and always harbored the requisite intent or knowledge to deceive his customer and thereby deprive him of the value of at least a substantial portion of the property thus unlawfully obtained.
Taylor , 450 S.W.3d at 537 (emphasis in original). Although the court of appeals was correct that the evidence shows Appellant performed part of the contracts at issue in Count Two, I disagree with its conclusion that the State failed to provide any, much less sufficient, evidence that Appellant intended not to perform other parts of the contracts-specifically, the cremation services-at the time he accepted the money.
Four of the complainants listed in the indictment testified at Appellant's trial: Margaret Francois (Count One), and Michelle Jones-McElhanon, Desiree Williams, and Fred Jones (Count Two). All four testified that they contracted for funeral services, which included a cremation, and that Appellant delayed in delivering the ashes as promised. Both Williams and Jones-McElhanon testified that they did eventually receive cremains,[20] but both later discovered *244 that the cremains were not those of their family member. Fred Jones and Margaret Francois testified that they never received any cremains at all and were given various excuses by Appellant as to why the cremains were delayed.
The court of appeals believed that the only fact this evidence fairly demonstrated was that "the family members expected the funeral home to do its job in a workman-like and timely manner, and it did not do so." Johnson , 513 S.W.3d at 201. But this inference is not the only inference a jury could have rationally drawn from the complainants' testimony. A rational jury could well have believed, from the testimony given, not only that Appellant failed to complete his contractual obligations to cremate the bodies in a workman-like and timely manner, but also that Appellant never expected to perform the cremations and return the ashes to their respective families as promised in the first place . In fact, the State presented two additional witnesses, not named in the indictment, whose testimony served to reinforce this alternative inference.
The first witness, Nakia Davis, testified that she contacted Appellant in January of 2014 to arrange a cremation and funeral service for her father, Larry Ray Davis. She requested that most of her father's cremains be placed at the Dallas-Forth Worth National Cemetery while the rest be given to her and her family. The funeral service was performed, and Appellant purported to bring Larry Ray Davis's cremains to the cemetery for interment. However, Davis later learned that her father was not actually cremated until February 21, well after his funeral had taken place. Thus, the remains interred at the Dallas-Fort Worth National Cemetery could not have been those of her father. The second witness, Felicia Braxton, testified that she contacted Appellant after her mother, Aundrea Marie Jones, died on February 8, 2014. A funeral service was held on February 15, 2014, and Braxton was informed that she would receive her mother's cremains in three days. She did not receive any cremains until weeks later, however, and in July of 2014 Braxton discovered that the ashes she had eventually received were those of Opal Mae Anderson, who had died on December 8, 2012. Both Braxton and Davis testified that they had been forced to contact Appellant multiple times before they received the incorrect cremains.
The Penal Code specifically contemplates that Davis's and Braxton's testimony be available as evidence to prove a culpable mental state in contractual obligations: "[E]vidence that the [defendant] has previously participated in recent transactions other than, but similar to, that which the prosecution is based is admissible for the purpose of showing knowledge or intent and the issues of knowledge or intent are raised by the [defendant's] plea of not guilty." TEX. PENAL CODE § 31.03(c)(1). Although it was possible for the jury to conclude otherwise, the additional testimony from Davis and Braxton offered to corroborate the testimony of the complainants that Appellant constantly delayed in cremating and delivering cremains was enough for a rational jury to find that Appellant never intended to perform the specific cremation services-that he would cremate and deliver the ashes of the loved one to the client he contracted with-at the time he took the money. See Jackson , 443 U.S. at 319, 99 S.Ct. 2781 (requiring the State to present enough evidence for a fact finder to find every element of an offense was committed beyond a reasonable doubt). I am not convinced, nor has *245 Appellant argued, that the complainants in this case would have paid Appellant any amount of money to cremate their relatives' bodies if they were not to receive the cremains as requested.
Even assuming that Appellant intended to conduct the other services he promised, then, a rational jury would be justified in concluding that he never intended to cremate the bodies as promised. Moreover, the value of the cremation services was sufficient to support a finding that property of enough value was unlawfully appropriated to satisfy the statutory requisite for a state jail felony-at least $1,500. Although Michelle Jones-McElhanon paid a total of $3,025 for funeral services for Karen Jones, she testified that Appellant itemized the services for her and charged her $1,000 for the cremation. Desiree Williams testified that Appellant charged her $300 for the cremation of the infant, Titus Harrison. Fred Jones was charged $2,800 for funeral services for Helen Jones. While he did not testify that Appellant itemized the cost of cremation for him, a print-out of the mortuary's web site was introduced into evidence showing that the least expensive cremation service for the body of an adult cost $500. From this combination of evidence, the jury could rationally have concluded that Appellant charged at least $1,800 for the cremation of the three bodies alleged in Count Two of the indictment. Thus, even if we limit the value of property unlawfully appropriated to the cost of the cremation services alone-services which the evidence adequately demonstrated Appellant did not intend to perform-the amount satisfies the minimum required to support his conviction for a state-jail felony.
IV. CONCLUSION
For the reasons stated above, I agree that the evidence was legally sufficient to support Appellant's conviction on both Counts One and Two in the indictment. Accordingly, I concur in the Court's judgment to reverse the judgment of the court of appeals and remand the cause to the court of appeals to resolve Appellant's remaining points of error on direct appeal.
CONCURRING OPINION
Walker, J., filed a concurring opinion in which Keller, P.J., joined.
In discussing whether there was sufficient evidence to support the jury's guilty verdict on Count I,[1] the majority and Judge Yeary's concurring opinions consider whether the evidence was sufficient to show that Appellant was guilty as a party either under section 7(a)(2) as charged, or under a section 7(a)(1) theory, respectively. However, the indictment did not charge Appellant as a party. The indictment alleged that Appellant committed the offense as a primary actor, and the jury's instructions authorized his conviction not just as a party but also as a primary actor. "[W]hen the trial court's charge authorizes the jury to convict on several different theories ... the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories." Swearingen v. State , 101 S.W.3d 89, 95 (Tex. Crim. App. 2003). The evidence is sufficient on the theory that Appellant was guilty as a primary actor, and for that reason I concur in the Court's decision to reverse the judgment of the court of appeals.
*246 Sufficient Evidence Shows Appropriation as a Primary Actor
A person commits the offense of theft if he unlawfully appropriates property with the intent to deprive the owner of that property. TEX. PENAL CODE Ann. § 31.03(a). Appellant's argument on appeal, and again before this Court, is that the evidence is insufficient to support the guilty verdict because one of the elements of theft, appropriation, is not shown. "Appropriate" means:
(A) to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; or
(B) to acquire or otherwise exercise control over property other than real property.
TEX. PENAL CODE Ann. § 31.01(4) (emphasis added). Appellant argues that he did not exercise control over Francois's money because he was not the named payee on the check. Therefore, the argument goes, he could not have appropriated Francois's property.
In his brief to this Court and in his brief to the court of appeals, Appellant's argument relies upon Newman v. State , 115 S.W.3d 118 (Tex. App.-Texarkana 2003, no pet.). In Newman , the defendant was charged with theft of "United States currency in the form of a check," and he was convicted. Id. at 119-20, 121. On appeal, Newman argued that the evidence was insufficient because there was no proof that he actually controlled the money represented by the check. Id. at 121. Appellant, in his brief, quotes the following passage in Newman :
This argument, however, is without merit. First, the State indicted [Newman] for the theft of the check itself, not the funds represented by the check. This is an important distinction. Under the indictment, the State was required to prove [Newman] unlawfully appropriated a check worth $79,218.38, not to show that the funds represented by the check were ever actually controlled by [Newman].
Appellant's Reply Br. 9 (quoting Newman , 115 S.W.3d at 122 ). Appellant seizes upon this language and points out that he was indicted for theft of money, not a check. "In other words, Appellant may have exercised control over the check, but not the currency it represented." Id.
In essence, Appellant argues there is a fatal variance between the indictment alleging theft of money and the evidence showing theft of a check. But it is well-settled that there is no fatal variance between an indictment alleging theft of money and evidence showing theft of a check. See Jackson v. State , 646 S.W.2d 225, 226 (Tex. Crim. App. 1983) ; Kirkpatrick v. State , 515 S.W.2d 289, 293 (Tex. Crim. App. 1974) ; Rick v. State , 151 Tex.Crim. 426, 207 S.W.2d 629, 630 (1947). A check is an instrumentality by which one receives money. Jackson , 646 S.W.2d at 226.
The court of appeals, however, found significant to the "control" issue the fact that Appellant did not negotiate Francois's check:
Appellant argues that the evidence is insufficient to support the guilty verdict in Count One because he was charged with appropriation of the cash and not the check. The evidence shows that he possessed the check from Francois, not cash. The check was made out to and deposited in the account of Johnson Family Mortuary. Had the check been made out to Appellant, and had he negotiated the check, he obviously would have exercised control over the money. But the evidence shows that Appellant was not a signatory on the funeral home *247 account. He was not an owner of Johnson Family Mortuary. He argues that the check represented to him just that-a check over which only his wife could have exercised control. Proof of appropriation of a check is not proof of appropriation of money unless there is also proof that the accused negotiated the check.
Johnson v. State , 513 S.W.3d 190, 196 (Tex. App.-Fort Worth 2016, pet. granted). To support that last statement, the court of appeals cited Orr v. State , 836 S.W.2d 315, 319 (Tex. App.-Austin 1992, no pet.). The State argues that the court of appeals's reliance on Orr was mistaken. I agree.
In Orr , the evidence showed that the victim, McCann, purchased several oil and gas wells from Pitco Energy Company. Id. at 315-16. After the purchase, McCann realized that Orr and Pitchford, who was Pitco's president, provided false information about the wells' production. Id. at 317. Mechanisms on the wells had been manipulated, and consequently they reported greater production than what the wells were actually producing. Id. Orr and Pitchford were both charged with theft, and the State's theory at trial was that Orr and Pitchford knew the reports were false and used those false reports to deceive McCann into paying more for the wells than they were worth. Id. On appeal, Orr argued that the evidence was insufficient to show appropriation of "cash money," as alleged in the indictment, because McCann paid Pitco with money orders. Id. at 318. The Austin Court of Appeals agreed and held that there was a fatal variance. Id. Because there was no proof that the money orders were ever negotiated by anyone, the evidence was insufficient to show that "cash money" was appropriated from the victim. Id. at 319.
Assuming, for the sake of argument, that Orr was correctly decided, it was misapplied by the court of appeals in this case. Unlike Orr , in this case there was proof that Francois's cashier's check was negotiated. It was deposited by Appellant's wife. This simple fact makes Orr distinguishable, and other courts have distinguished Orr for the same reason. For example, in Mueshler v. State , the defendant was her workplace's office manager and bookkeeper and was responsible for receiving and paying the company's bills. Mueshler v. State , 178 S.W.3d 151, 152 (Tex. App.-Houston [1st Dist.] 2005, pet. ref'd). The firm's owner frequently signed blank checks for Mueshler to use to pay the company's bills while he was away from the office. Id. Mueshler instead wrote several checks from the business to herself and to her creditors. Id. Mueshler was convicted of theft, and on appeal she argued that there was insufficient evidence to support the verdict because the indictment alleged theft of cash money, and the proof showed theft by writing checks. Id. at 152, 153. In support of her argument, Mueshler cited to Orr . Id. at 155. The court of appeals in Mueshler , however, distinguished Orr because the "State introduced evidence that the unauthorized checks written by Mueshler were negotiated-such that the bank used cash from the firm's checking account to pay for them." Id. The court of appeals thus held that the evidence was sufficient to sustain Mueshler's conviction of theft of cash money. Id.
Similarly, the Austin Court of Appeals-the very same court that issued the opinion in Orr -distinguished Orr in Denton v. State , No. 03-96-00006-CR, 1998 WL 476459 (Tex. App.-Austin Aug. 13, 1998, pet. ref'd) (mem. op., not designated for publication). Denton was the executive director of the Texas Department of Public Safety Officers Association (DPSOA), and the evidence showed that he wrote a number *248 of checks from DPSOA, payable to South Coast, a corporation organized and run by some of Denton's close friends. Id. at *1-2. Denton was convicted of theft, and on appeal he argued that there was a fatal variance between the indictment, which alleged theft of "lawful United States currency," and the evidence at trial, which showed checks. Id. at *1, 5. The Austin Court of Appeals found its Orr opinion distinguishable because the evidence showed that the DPSOA checks Denton wrote to South Coast were actually negotiated by South Coast. Id. at *5. Additionally, the court of appeals dismissed Denton's argument that the State had to prove that he personally negotiated the checks in order for the checks to be considered the same as lawful United States currency. Id. at *6.
Just as in Mueshler and Denton , in this case there was evidence that the check was negotiated. Appellant's wife, Hardy, deposited Francois's cashier's check into the business's account. Orr is distinguishable.[2]
Chief Justice Livingston, dissenting to the court of appeals's majority below, argued that additional factors showed that Appellant controlled Francois's property. Appellant was heavily involved with the day-to-day aspects of the business:
The State proved that appellant held himself out as a co-owner of the mortuary, that he did everything "but the paperwork" there, that he negotiated contracts, that he signed documents that the mortuary submitted to the medical examiner's office, that he alone represented the mortuary in negotiating a lease, that he accepted cash from clients on behalf of the business and gave them receipts (including signing Francois's receipt), that he alone was the point person in conversations about paying rent and about eviction for failure to pay the rent (including making a "gentleman's handshake" agreement on rent matters), and that he assisted the police in identifying decomposing bodies (while his wife believed "there was only one body there"). Francois testified that she spoke only with appellant about services the mortuary agreed to provide for a decedent.
Johnson , 513 S.W.3d at 203 (Livingston, C.J., dissenting). Chief Justice Livington's point is well-taken, and the jury would have been reasonable in inferring that Appellant actually controlled Francois's money through the business, which he exercised a great deal of control over.
Additionally, the dissent argued that, at the time Appellant exercised control over Francois's cashier's check, he also exercised control over the money it represented. Id. The court of appeals's majority disagreed with this assertion and concluded "[w]hen Appellant possessed the check, he did not possess the $1,500. He 'was in possession of a piece of paper worth, at the most, pennies.' " Id. at 199 (quoting Heimlich v. State , 988 S.W.2d 382, 385 (Tex. App.-Houston [14th Dist.] 1999, pet. ref'd) ).
The property at issue in this case-Francois's cashier's check-was worth far more than mere pennies. Because Francois's cashier's check was not made payable to Appellant, the court of appeals declared that "[t]he cashier's check was payable only to the funeral home and of no significant value except to the funeral home." Id. In Simmons v. State , we similarly recognized that "[a]n unendorsed *249 check made out to a specific person does not have a readily ascertainable market value because there is not much of a commercial market for unendorsed checks." Simmons v. State , 109 S.W.3d 469, 473 (Tex. Crim. App. 2003). "Thus, although a check that is made out to 'Ricci Charles Simmons' may have great value to both its maker and its intended recipient, Mr. Simmons, it has very little legal commercial market value unless and until it is endorsed." Id. Nevertheless, we noted that "the vast majority of American jurisdictions hold that 'the value of a check, in the absence of proof to show a lesser value, is measured by what the owner of the check could expect to receive for the check at the time of the theft, i.e., the check's face value.' " Id. at 474 (quoting State v. Harris , 708 So.2d 387, 389 (La. 1998) ). Rejecting the notion that Texas is a "minority view" state, we clarified that Texas:
has followed and does follow the majority rule absent special circumstances. Thus, a check is a "document that represents or embodies value" and checks embody, in ... all but the exceptional cases, a value equivalent to what is written on their faces. Accordingly, we hold that the face amount of the instrument is presumptive evidence of its value. Assuming that no evidence is produced to rebut the logical inference that the payee was entitled to receive the face amount of the check, it is sufficient evidence of value to show the face amount of the check.
Id. at 477-78.
It is true that the checks at issue in Simmons were made payable to the defendant in that case, and Francois's check in this case was made payable, not to Appellant, but to the Johnson Family Mortuary. But the fact that Appellant was not the named payee on the cashier's check does not make Simmons distinguishable. In Cooper v. State , the defendant stole a number of bills and an unendorsed check from a cash drawer. Cooper v. State , 509 S.W.2d 865, 866 (Tex. Crim. App. 1974). The check was made by Frito-Lay, Inc., and was payable to the Rhodes Auto Service in the amount of $51.86. Id. After Cooper was arrested, payment on the check was stopped. Id. at 867. On appeal, Cooper argued that the unendorsed check had no value. Id. We disagreed:
the evidence was that the check had the value of $51.86 and, upon endorsement, could have been sold for that amount or would have been paid in the sum of $51.86 upon presentation. A check may be the subject of theft, and the fact that the check was not endorsed when it was stolen will not protect appellant.
Id. Such is the case here. Francois's cashier's check, upon endorsement, could have been sold for $1,500. It also would have been paid in the sum of $1,500 upon presentation.
In Simmons , we recognized that there are exceptions and unusual cases where the evidence can rebut the presumption, such as proof that the maker of the check lacked sufficient funds or that the bank was insolvent. Simmons , 109 S.W.3d at 475. In this case, there was no such evidence that rebutted the presumption.
It is also highly doubtful that any such proof which could rebut the Simmons presumption, that the face amount of a check is its value, could have been presented in this case. The check in this case was a cashier's check. Unlike a regular check, a cashier's check is drawn by the bank on itself and accepted in advance by the act of its issuance, and it is therefore not subject to countermand by either its purchaser or the issuing bank. Wertz v. Richardson Heights Bank and Tr. , 495 S.W.2d 572, 574 (Tex. 1973). A cashier's check is accepted when issued, and *250 section 4.303 of the Business and Commerce Code prevents a bank from making a stop payment order after the cashier's check has been issued.[3] Id.
As we said in Simmons , "[c]hecks are negotiable instruments and they play an important role in Texas, American, and international commercial transactions, serving, to a considerable degree, as a cash equivalent." Simmons , 109 S.W.3d at 475. To the extent that is true for regular checks, cashier's checks are even closer to cash, and our courts have treated cashier's checks as equivalent to cash. See Dilling v. Nationsbank, N.A. , 897 S.W.2d 451, 457 (Tex. App.-Waco 1995), rev'd on other grounds , 922 S.W.2d 950, 952 (Tex. 1996) (rejecting bank's argument "because of the ease with which cashier's checks are passed, virtually as a cash equivalent, in the business community"); Arline v. Omnibank, N.A. , 894 S.W.2d 76, 82 (Tex. App.-Houston [14th Dist.] 1995, no writ) ("Having accepted the check upon issuance, Omnibank's cashier's check was the functional equivalent of cash."); Angelo v. Chem. Bank and Tr. Co. , 529 S.W.2d 783, 786 (Tex. App.-Dallas 1975, writ dism'd) ("We hold that where the evidence, as in this case, discloses that plaintiffs tendered a cashier's check, as opposed to a check drawn on plaintiffs' personal account, for the total purchase price, plaintiffs have complied with the requirement of the contract stating that payment was to be made in cash."); Cmty. Nat'l Bank v. Channelview Bank , 814 S.W.2d 424, 427 (Tex. App-Houston [1st Dist.] 1991, no writ) ("A cashier's check circulates through commerce as the equivalent of cash."); see also Tarrant Wholesale Drug Co. v. Kendall , 223 S.W.2d 964, 967 (Tex. App.-San Antonio 1949, no writ) (in a pre-UCC case, "Cashier's checks are regarded substantially as the money which they represent.").[4]
Thus, contrary to the court of appeals's characterization of Francois's cashier's check as worth "mere pennies," it was worth its face value: $1,500. Regardless of whether Appellant could personally negotiate the cashier's check or not, Francois was deprived of property worth that amount. On that score, I return to section 31.01(4), defining "appropriate":
(4) "Appropriate" means:
(A) to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; or
(B) to acquire or otherwise exercise control over property other than real property.
TEX. PENAL CODE Ann. § 31.01(4) (emphasis added). As written, section 31.01(4)(B) provides two ways of appropriation, either acquiring property or otherwise exercising control over property. The indictment alleged that Appellant appropriated Francois's money "by acquiring or otherwise exercising control over property," and thus the State needed to prove that Appellant either acquired Francois's property or otherwise exercised control over the property. While the court of appeals devoted time and attention to whether Appellant controlled Francois's money through the instrumentality *251 of the check, it did not consider whether he acquired it.
Acquire is not defined in the penal code. When interpreting statutes, we necessarily focus on the literal text of the statute in question and attempt to discern the fair, objective meaning of that text at the time of its enactment. Boykin v. State , 818 S.W.2d 782, 785 (Tex. Crim. App. 1991). If the meaning of the statutory text, when read using the established canons of construction relating to such text, should have been plain to the legislators who voted on it, we ordinarily give effect to that plain meaning. Id. Where application of the statute's plain language would lead to absurd consequences that the Legislature could not possibly have intended, we should not apply the language literally. Id.
What is the plain meaning of "acquire"? To "acquire" something is: "to get or gain by one's own efforts or actions ... to come to have as one's own; get possession of." Houghton Mifflin Harcourt, Webster's New World College Dictionary (5th ed. 2016); see also Acquire , Black's Law Dictionary (10th ed. 2014) ("To gain possession or control of; to get or obtain."). This definition of "acquire" fits the theft statute without causing any absurd consequence: a person who unlawfully possesses, gets, or obtains the property of another, with the intent to deprive that other person of the property, is a thief. Plainly, Appellant came into possession of Francois's check when she handed it to him. Appellant got the check. Appellant obtained the check. He acquired the check when Francois gave it to him, and, consequently, he appropriated the check.
For all of these reasons: (1) allegation of theft of money and proof of theft of a check is not a fatal variance; (2) Orr does not apply because the check was deposited into the business account, which was owned by Appellant's wife; (3) even if the "controller" of the check was the business, Appellant had a significant hand in running the business; (4) the business was an LLC owned by Appellant's wife and Texas is a community property state; and (5) Appellant acquired Francois's money in the form of the check, I believe the evidence is sufficient to show that Appellant appropriated Francois's money. Therefore, the guilty verdict on Count I-theft of Francois's money-is supported by sufficient evidence. The court of appeals erred in finding otherwise.
Conclusion
In conclusion, the jury found Appellant guilty on a charge that authorized conviction as a primary actor, and the evidence is sufficient to support that verdict. Appellant appropriated Francois's money when he acquired her cashier's check. As for the other elements of theft, I agree with the analysis and conclusion of both the majority opinion and Judge Yeary's concurring opinion that Appellant's appropriation was unlawful, and, at the time he unlawfully appropriated Francois's property, Appellant had the requisite intent to deprive. Because there is sufficient evidence to show that Appellant was guilty as a primary actor, we need not delve into whether the evidence is also sufficient to show he was guilty as a party. Vasquez v. State , 665 S.W.2d 484, 487 (Tex. Crim. App. 1984), disapproved on other grounds by Gonzales v. State , 723 S.W.2d 746, 751 (Tex. Crim. App. 1987) ("If there is sufficient evidence to prove one of the two ways of committing the offense, this Court need not consider whether the evidence is also sufficient to prove the alternative theory.").[5] The majority *252 and concurring opinions' discussion of whether Appellant is guilty on Count I as a party is unnecessary. I concur in the Court's decision to reverse as to Count I, and I join the majority opinion as to Count II.

Unless otherwise noted, all dates throughout this opinion reference 2014.

Throughout the remainder of this opinion, references to "Section" are to the Texas Penal Code.

Indeed, Appellant's wife cannot have even committed attempted theft without the requisite culpable mental state. Tex. Penal Code § 15.01(a).

While discussing Appellant's role in transporting remains, one detective testified that Appellant claimed: "[I]f you request Johnson, you're going to get Johnson." Additionally, Appellant oversaw about ninety-nine percent of the transportation of the bodies for cremation.

Multiple crematoriums required the mortuary to pay up front, and at least one required that the mortuary provide the necessary paperwork before it would store any bodies after the mortuary left a five year old boy in the crematorium's cooler for five months.

See Tex. Occ. Code § 651.403 ("A funeral establishment shall designate to the [Texas Funeral Service Commission] a funeral director in charge ... [who] is directly responsible for the funeral directing and embalming business."); Tex. Health & Safety Code § 193.002 ("A person in charge of interment ... shall obtain and file the death certificate.").

Pierce was not removed from the system until July of 2014.

Both Appellant and his wife completed a certification course called "Understanding and Using the Texas Electronic Register." Further, John Nganga, who had previously served as a kind of provisional funeral director for the mortuary, testified that he had taught Appellant how to operate the TER system.

At the time the offense was committed, theft of property valued at $1,500 but less than $20,000 was a state jail felony. Tex. Penal Code § 31.03. In 2015, the Legislature amended the statute so that, to constitute a state jail felony, the value of the property stolen must be at least $2,500 but less than $30,000. Acts of June 20, 2015, 84th Leg., ch. 1251, § 10, p. 4213, eff. Sept. 1, 2015.

Francois and Appellant agreed to wait until after the July 4th holiday to finalize the contract.

Francois disputed this at trial, testifying that, although she had made the request from her brother to view the cremation, she quickly abandoned the idea once Appellant informed her that the viewing would entail an additional cost.

"Little Texas" was the name used to refer to "Little Texas Car Dealership," which was owned by Tony Jones. Count Two of the indictment listed this particular complainant only as Little Texas. It is not immediately clear from the record why Count Two alleged Tony Jones and Little Texas as separate complainants.

The court of appeals acknowledged, however, that "[h]ad the check been made out to Appellant, and had he negotiated the check, he obviously would have exercised control over the money." Johnson v. State , 513 S.W.3d at 196 (citing Tex. Penal Code § 31.01(4)(B) ).

The dissenting opinion in the court of appeals would have held that "when [A]ppellant exercised control over [Francois's] check, he also exercised control over the money it represented, either on the mortuary's behalf or his own behalf." Johnson , 513 S.W.3d at 203. This view is inconsistent with the cases cited above. Controlling precedents from this Court make clear that the mere possession of a check, however unlawful, is insufficient to support a conviction for the theft of money. See Lieske v. State , 60 Tex.Crim. 276, 131 S.W. 1126, 1126-27 (1910) ; Wimer v. State , 48 S.W.2d 296, 303 (Tex. Crim. App. 1932). In Jackson v. State , we noted that a check could be the instrumentality by which a defendant acquires the underlying money that the check represents. 646 S.W.2d 225, 226 (Tex. Crim. App. 1983). But it is the use of the check to obtain the money, not the possession of the check, that determines whether the evidence sufficiently demonstrates that a defendant exercised control over money. See ids="11306489" index="149" url="https://cite.case.law/sw2d/646/225/#p226">id. ("The check was the instrumentality by which appellant received the cash. The use of a check does not render the evidence insufficient."). On the facts of this case, it was Hardy, not Appellant, who endorsed the check, and it was deposited into a business account over which Appellant had no signatory authority. Although a State's witness testified that none of the $1,500 that the check represented was spent on Baptiste's cremation, and the money was instead used for personal expenses, there was no evidence presented that Appellant was the individual who spent the money. There was no evidence to suggest that Appellant personally used the check to obtain control over the money. To adopt the dissenting opinion's view based on these facts would be tantamount to overruling our earlier precedent.
The dissent in the court of appeals also suggested it would have found Appellant criminally responsible for the offense under Section 7.23(a) of the Penal Code, which states that "[a]n individual is criminally responsible for conduct that he performs in the name of or in behalf of a corporation or association to the same extent as if the conduct were performed in his own name or behalf." Johnson , 513 S.W.3d at 203 (quoting Tex. Penal Code § 7.23(a) ) (emphasis added). But, as I have stated above, Appellant's appropriation of the check did not constitute an appropriation of the underlying money because Appellant did not use the check to acquire the money. Because Appellant's conduct on his own behalf did not amount to an appropriation of money, it follows that his conduct on behalf of the corporation was also not an appropriation of money. Section 7.23(a) simply prevents defendants from insulating themselves from liability for offenses they personally commit by hiding behind the veil of a corporate entity. See, e.g. , Littlefield v. State , 586 S.W.2d 534, 535-36 (Tex. Crim. App. 1979) (applying Section 7.23(a) and finding no reversible error in a case revoking the defendant's probation where the defendant signed an automobile lease on behalf of a corporation and subsequently failed to make the lease payments). Thus, Section 7.23(a) can provide no independent basis for vicarious criminal responsibility on the facts of this case.

Judge Walker takes the view that the check may be treated the same as money for sufficiency-of-the-evidence purposes so long as the State shows it was negotiated by someone . But he cites no case in which we have ever so held, and it does not stand to reason. Because Appellant could not have negotiated the check, since he was not the designated payee, nor did he even attempt to cash or otherwise negotiate it, he cannot have appropriated the money that the check promised to pay. While he briefly acquired and exercised control over the check itself, he neither acquired nor exercised control over the money itself. Judge Walker cites two theft cases for the proposition that a check is the same as money. Concurring Opinion at ---- - ----. Neither case supports that proposition. In Simmons v. State , 109 S.W.3d 469 (Tex. Crim. App. 2003), the property alleged to have been stolen was itself two checks, and the issue in the case was how to ascertain their value for purposes of determining the level of the offense. In Cooper v. State , 509 S.W.2d 865 (Tex. Crim. App. 1974), the Court's opinion failed to describe exactly what property was alleged in the indictment to have been stolen, but the evidence showed theft of both cash and an unendorsed check from a company's till. Again, the issue was how to assign a value to the check for purposes of proving the value of the property specifically alleged to have been stolen-whatever it was. Neither Simmons nor Cooper can fairly be read to support Judge Walker's view that, so long as it is negotiated by someone , a check will be regarded as the same as money for purposes of proving up an indictment that alleged the theft of money. The fact remains that, under our holding in Wimer , a check is not the same as money unless and until the thief "in fact received the money on the check he obtained." 48 S.W.2d at 303.

Throughout its opinion, the court of appeals cited Section 7.02(a) generally, instead of specifically citing Subsection 7.02(a)(2). The State's theory at trial focused solely on Appellant's potential liability under Section 7.02(a)(2). The court of appeals, likewise, reviewed the evidence against Section 7.02(a)(2) exclusively, despite citing Section 7.02(a) broadly in its analysis.

The jury was authorized to convict Appellant either as a primary actor or as a party under Section 7.02(a)(2). We cannot know for sure under which theory the jury actually convicted appellant, but as long as the evidence will support one or the other, a reviewing court is obliged to declare the evidence to be legally sufficient. E.g. , Rabbani v. State , 847 S.W.2d 555, 558-59 (Tex. Crim. App. 1992).

Because the jury thus essentially found Appellant criminally responsible under Section 7.02(a)(1), we are not confronted with the situation in which he was convicted on the basis of a theory never submitted to the jury. Thus, there is no potential due process impediment to our considering Section 7.02(a)(1)'s theory of vicarious criminal responsibility in our legal sufficiency analysis in the guise of Malik 's hypothetically correct jury charge. See Wooley v. State , 273 S.W.3d 260, 268-72 (Tex. Crim. App. 2008) (an appellate court violates an appellant's right to due process when it holds the evidence to be legally sufficient on the basis of a legal theory not submitted to the jury).
In any event, "[a] reviewing court's limited determination on sufficiency review ... does not rest on how the jury was instructed." Musacchio v. United States , --- U.S. ----, 136 S.Ct. 709, 715, 193 L.Ed.2d 639 (2016). Even if it could be said that Section 7.02(a)(1) was not, for all intents and purposes, "submitted to the jury" in this case, it would not affect the hypothetically correct jury charge for purposes of a legal sufficiency analysis. Since Wooley , we have made it clear that the hypothetically correct jury charge remains unaffected by an imperfection in the way the law of parties was submitted to the jury. See Adames v. State , 353 S.W.3d 854, 861-62 (Tex. Crim. App. 2011) (a jury charge that included a "general instruction on the law of parties," but which failed to require the jury to find a capital defendant to have intended to facilitate his co-defendant's commission, not only of the underlying felony, but also of the murder itself would not limit the appellate court's understanding of the hypothetically correct jury charge for purposes of determining legal sufficiency of the evidence); Garza Vega v. State , 267 S.W.3d 912, 915-16 (Tex. Crim. App. 2008) (where the jury charge abstractly defined the law of parties under both Section 7.02(a)(2) and Section 7.02(b) of the Penal Code, but only included the former theory in the application paragraph, the appellate court should nevertheless properly include the Section 7.02(b) theory of parties liability in its hypothetically correct jury charge for purposes of evaluating legal sufficiency). "All that a defendant is entitled to on a sufficiency challenge is for the court to make a 'legal' determination whether the evidence is strong enough to reach a jury at all." Musacchio , 136 S.Ct. at 715.
Whether a less-than-perfect jury instruction presents trial error in the case is a distinct question. In Adames , we recognized that a due process claim of lack of notice stemming from an imperfect jury charge is distinct from a due process claim that the evidence is legally insufficient. 353 S.W.3d at 859. Any such deficiency in the jury charge is essentially a matter of trial error, not legal sufficiency, and might, under appropriate circumstances, lead to a new trial, but not to an acquittal. See id. at 860 ("This is a case of jury-charge error distinct from evidentiary insufficiency; appellant was convicted on a theory, guilt as a party, that was not presented to the jury, as opposed to a charge for which he was never tried."); see also Musacchio , 136 S.Ct. at 715 n.2 (leaving open the question of whether "an erroneous jury instruction" may still lead to "reversible error" even when "the evidence was sufficient to support a conviction"). We are not presented with such circumstances here.

The terms also include persons who, while potentially harboring culpable intent and therefore aware that their conduct is unlawful, are nevertheless incapable of being punished, such as children. The language in the 1856 penal code on the law of parties with respect to innocent persons stated: "If any one, by employing a child or other person, who cannot be punished, to commit an offense ... by any ... indirect means ... the offender, by the use of such indirect means, becomes a principal." O.C. art. 217 (1856) (emphasis added). The term "child" was included in each subsequent re-codification of the penal code in 1879, 1895, 1911 (all as Article 77) and 1925 (as Article 68). When the penal code was again re-codified in 1974, the term "child" was removed and the terms "innocent" and "non-responsible person" were added. Tex. Penal Code § 7.02(a)(1). However, the practice commentary to the 1974 Penal Code indicates that the new terms were not meant to alter the law and, instead, incorporated the term "child" from the previous iterations of Article 217. Tex. Penal Code § 7.02(a) practice cmt. (West 1974).

No evidence exists in the record indicating that Appellant or the mortuary ever contacted or attempted to contact another FDIC for purposes of reestablishing the mortuary's account in the TER.

See Tex. Penal Code § 31.09 (permitting the aggregation of theft offenses for purposes of determining the grade of offense when they are committed "pursuant to one scheme or continuing course of conduct"). Here, the State alleged theft in the aggregate of at least $1,500, making the offense charged in Count Two a state jail felony. See note 7, ante .

"Cremains" are defined as "[a]shes remaining after the cremation of a corpse." Webster's II New College Dictionary 266 (1999).

With regard to Count II, I agree with the majority opinion that the evidence shows Appellant intended to deprive the victims named in that count of their money intended to pay for cremation services, even if the evidence shows he performed other paid-for services. See Majority Op. at ---- - ----.

My discussion of Orr and how that case is distinguishable from the case before the Court today should not be taken as tacit or implicit approval of the decision in that case. The court of appeals relied upon it, however, and the point is that the court of appeals misapplied the case it relied upon.

However, in certain narrowly defined circumstances, a bank obligated to pay a cashier's check may have defenses against the person asserting the right to enforce the check. Tex. Bus. & Com. Code Ann. § 3.411(c).

This "cash equivalent" view of cashier's checks is shared by a majority of jurisdictions. See generally Stringfellow v. First Am. Nat'l Bank , 878 S.W.2d 940, 943-44, 943 nn.3-4 (Tenn. 1994) (discussing the "cash equivalent" approach versus the "ordinary negotiable instrument" approach; collecting cases on both sides, including Wertz ; and adopting the "cash equivalent" approach in Tennessee).

See also Pinkerton v. State , 660 S.W.2d 58, 62 (Tex. Crim. App. 1983) ("Since the State proved murder during the course of burglary, we need not consider whether the evidence is sufficient to show murder during the course of robbery."); Wright v. State , 364 S.W.2d 384, 387 (Tex. Crim. App. 1963) ("There being sufficient evidence to support a finding by the jury that appellant obtained carnal knowledge of the prosecutrix without her consent by threats to kill her, while holding a knife at her side, we need not pass upon the question of whether the prosecutrix offered the resistance required where the state relies upon rape by force or by a combination of force and threats.").