**Opinion issued June 4, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00910-CR
_____

**ITANI LOSANGEL MILLENI, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 339th District Court**
**Harris County, Texas**
**Trial Court Case No. 1628261**

---

## MEMORANDUM OPINION

A jury convicted Trang Vu[1] for the murder of his wife, Tuyet Tran. On appeal,

Trang raises three issues. He challenges the sufficiency of the evidence to support

---

[1]     Trang Vu legally changed his name to Itani Losangel Milleni in 2015. We refer to him as Trang Vu for consistency with the record in this case.

his conviction because he claims the State failed to prove his identity beyond a reasonable doubt, he challenges the jury charge because he claims it permitted the jury to convict him on an alternative theory not supported by the evidence, and he claims the trial court erred in allowing a retrial after the first attempt ended in a mistrial. We affirm the trial court's judgment.

## BACKGROUND

### *Trang's and Tuyet's Relationship*

Trang's sister arranged Trang's first meeting with Tuyet in Vietnam in 2001. Trang and Tuyet married three weeks later. They came to the United States and traveled before settling down in the Houston area. They had two children. They opened a salon that provided training classes and sold beauty products, called Signature Beauty Show.

Trang's and Tuyet's marriage was at times violent. Tuyet's friend, Cindy Phan, witnessed Trang and Tuyet fighting at the salon one day, and she saw Trang choking Tuyet with his hands around her neck. Tuyet's niece, Diep Tran, lived with Trang and Tuyet for a few months. She said that there were many nights when she could hear Trang yelling at Tuyet in another room and what sounded like Tuyet crying and Trang hitting her. Diep also saw bruises on Tuyet's face after nights like that. Once, in March or April 2015, Diep heard Trang and Tuyet fighting in the back of their salon, then Diep saw Tuyet trying to run away, but when Tuyet got to the

2

front door, Trang punched Tuyet in the face. Diep said that she eventually moved out of the house because she was scared of Trang.

Child Protective Services began an investigation into the family in May 2015, although the record does not disclose why. In a CPS show-cause hearing that took place in early July 2015, Trang admitted that he choked Tuyet in front of the children. He also admitted to beating Tuyet at home and at the salon.

Tuyet was taking steps to gain independence from Trang in the weeks before her murder. She had moved out of their home and was living with a friend, Cindy Phan, in early July 2015. The couple had filed for divorce, although Trang explained it was a "fake divorce" so that CPS would end its investigation, and afterwards they intended to resume their relationship. But, separate from this "fake divorce," Tuyet contacted a family-law attorney on her own. This attorney, Natalie Nguyen, testified that when they first met, Tuyet was "very nervous[,] and she was scared." Nguyen tried to file a petition for divorce and a temporary restraining order against Trang on Tuyet's behalf in early July 2015. The district clerk's office rejected these filings, however, because there was already a pending divorce proceeding between Trang and Tuyet. Tuyet prepared an affidavit in support of the restraining order against Trang. In the affidavit, Tuyet described her husband as abusive and recounted multiple instances in which he threatened her, hit her, and choked her. She ended the affidavit with: "He has a gun and I am afraid for my body and my children every

3

time he has a hot temper that he might use it and shoot me." Tuyet was murdered about two weeks after her attorney attempted to file this affidavit.

Not only was Tuyet trying to gain legal independence from Trang, she was also taking steps to gain financial independence. Hai Pham was a friend of Trang's and Tuyet's and an investor in their salon. In May 2015, he and Tuyet decided to incorporate their salon business into an LLC. The document creating the LLC listed Hai and Tuyet as owners, but not Trang. Hai testified that was because Tuyet did not want Trang to be involved with the business anymore. He also said Tuyet had asked him to ask Trang not to come to the salon anymore, which he said he did.

*July 20, 2015*

On July 20, 2015, the day of Tuyet's murder, Tuyet was hosting a class on eyelash extensions at the salon. Tuyet invited a couple from California, Kelvin and Lucy Ho, to teach the one-day class. The class ran from 10 a.m. until about 6 p.m. Lucy explained that she and her husband had taught this class at the salon many times before; they typically would fly in from California the day before the class, teach the one-day class, stay for some discussion and to answer questions, then fly back to California the next day.

Meanwhile, at about 3 p.m. that afternoon, Trang met with Tequelia Armstrong, a CPS caseworker. Trang had requested the meeting because he wanted to begin working on their family plan. During the meeting, Tequelia told Trang that

4

the children would likely be placed with Tuyet. According to Tequelia, Trang said that would not be fair because Tuyet was not fit to raise the children and she had no formal education, and he would rather the children be placed in foster care than with their mother. Trang expressed that he cared a lot about the children's academic progress, and he did not think Tuyet could keep up with their academic progress. Tequelia said that Trang became hostile and started pacing the floor and yelling. At that point, Tequelia ended the meeting.

Trang said he went home to pick up a laptop after his meeting with Tequelia ended, then drove to the salon to help Tuyet. Trang arrived at the salon somewhere between 5 and 8 p.m. By the time Trang arrived, most of the students from the class had left. Tuyet, Kelvin and Lucy Ho, and an employee named Anna Tran remained at the salon.

At some point while they were at the salon, a stranger briefly entered. Lucy described him as skinny and tall with dark skin. She said some time in the afternoon, he walked in and asked to sell jewelry, but she told him no one wanted to buy jewelry, so he closed the door and left. Kelvin testified that around 4 or 5 p.m., when the class was almost over, a black man came into the store, looked around, and left. Anna said that around 3 p.m. a black man came into the salon trying to sell jewelry and handed her a piece of jewelry, but she did not want to buy it, so she handed it back. She said he spent about 3 to 5 minutes in the store. Trang told the police that,

5

while Tuyet and Lucy were handling the cash they had collected from the class, a black man came into the salon. As Trang described it:

> He's just like crazy. He came in and he look around and he stare at us. And we were scared, because we were doing the money transaction, my wife was splitting the money with Lucy. Everybody got scared and— well, we didn't say anything. We just stood there, and we wait and then he look around, look at us and then he went back outside.

After that, Trang said that he went outside to get the gun he kept in his car. Trang explained that the gun has a holster, and he clipped it to his waist, then he went back into the salon. He said the man was still outside the salon, talking with his friends in a car in the parking lot. Kelvin and Lucy testified that they never saw Trang with a gun that day.

Anna was the first to leave the salon. She left around 7 p.m. When she left, Kelvin, Lucy, Trang, and Tuyet were still there. Anna said that when she was in her car leaving the salon, around 7 p.m., she saw a black man enter the salon briefly, look inside, then turn around and leave. She could not recall if this was the same man they had seen earlier.

Kelvin and Lucy left next. Kelvin said they left around 7 p.m. Lucy said they thought it was safe to leave Tuyet at the salon because she had someone with her— in other words, they would not have left Tuyet working late at the salon alone. Kelvin and Lucy left to have dinner with friends.

6

According to what Trang told the police the next day, after Kelvin and Lucy left, he told Tuyet, "[L]et's leave too." He said that Tuyet locked the door to the salon and left for Cindy's house, where she had been staying because of their marital problems, and he got in his car and went home.

A surveillance video from the store next to the salon recorded thumping sounds and a woman screaming at 8:17 p.m. that evening. At 8:41 p.m., the video recorded more screaming, followed by silence.

Another surveillance video recorded the headlights on Tuyet's car flashing at 9:31 p.m., as if someone had remotely unlocked it. The video then showed someone getting into Tuyet's car, turning off the headlights, and driving away. Four minutes later, a surveillance video recorded Tuyet's car pulling into a shopping center parking lot that was about a half mile away from the salon. The car was abandoned there, with the key in the ignition. The driver's side window was broken, and there was glass on the ground around it, indicating the window was broken there in the parking lot where the car was abandoned, not in front of Tuyet's salon. The car also had a LoJack device, which is a tracking device, under the seat that was ripped out, although the cable was still connected. The glove compartment was open and appeared to have been ransacked, but nothing else in the car—including the boxes in the back—appeared to be disturbed.

Kelvin said that Trang called him late that night, around 11 p.m., which was unusual. Trang asked Kelvin and Lucy to come back to the salon the following day, which was odd for two reasons. First, Kelvin explained that normally Tuyet called Lucy to discuss anything relating to the class they taught, so it was strange for Trang to be calling him. Second, Trang knew that Kelvin and Lucy always taught a one-day class and left for California the following day, which they planned to do for this class.

That evening, several people tried calling Tuyet, but she never answered. Some called Trang after they could not reach Tuyet. Tina Dam, a close friend of Tuyet's, said that she called Tuyet several times that night, but Tuyet did not answer, which was unusual. She then called Trang at 10:20 p.m. According to Tina, Trang told her that Tuyet was not at the store so Tina should not go look for her there. He then told her to call Cindy, the friend with whom Tuyet was staying. Later, around midnight, Cindy came home and saw that Tuyet was not home yet, which was odd because Tuyet usually came home from work around 8 or 9 p.m. Cindy called Trang and asked where Tuyet was, and, according to Cindy, Trang said he had no idea, but he would call back in a few minutes. Trang called Cindy back a few minutes later and said that Tuyet might be with Tina, the friend who had called earlier looking for Tuyet.

Anna, the salon employee, arrived at the salon around 9 a.m. on July 21, 2015, the day after Tuyet's murder, for a follow-up class. Typically, after Kelvin and Lucy taught a class, Tuyet and Anna would hold a follow-up class the next day for students who needed more help practicing what they learned in the class. When Anna arrived at the salon, she noticed the lights were off and the open sign was not illuminated, so she thought the salon was not open yet, and she waited in the parking lot. She assumed Tuyet was running late. Anna saw two students walk into the salon—she realized the door was not locked. Anna tried calling Tuyet many times, but Tuyet never answered. Anna then called Trang, and he told her to be patient, because Tuyet was probably just late. He said to go ahead and go inside and start the class, and Lucy would come help.

Kelvin said that Trang called him that morning and asked him and Lucy to come back to the salon. Trang said some students needed help and wanted Kelvin and Lucy to come help them. Kelvin asked where Tuyet was, because she was supposed to be the one holding the follow-up class. Kelvin told Trang they planned to return to California that day, but after Anna called him and asked for help, he and Lucy went to the salon.

Hai Pham, Trang's and Tuyet's friend and investor in the salon, also came to the salon that morning, around 10:45 a.m. He walked into the salon and noticed a

sign on the floor and the cashier drawer open, so he first thought there had been a robbery. Hai called Trang because he thought Trang and Tuyet might have had a fight, and he wanted to check with them before calling the police. Hai asked Trang where Tuyet was, and Trang said he should call Cindy because Tuyet was staying with her. Hai walked around the salon some more, and at the back of the store, he saw someone's legs and feet coming from the back room and extending into the hallway. He called 911, and the operator instructed Hai to go into the back room and perform CPR on the person lying there. Hai realized the person was Tuyet, and he attempted to perform CPR, but she was already dead.

Dr. Jennifer Ross, the medical examiner who reviewed Tuyet's autopsy report, testified that the autopsy report concluded Tuyet's cause of death was blunt force head trauma. Tuyet sustained six major skull fractures and a total of thirteen strikes. Tuyet also had defensive wounds on her wrist, indicating she raised her arm to block an attack. Her injuries indicated she had been beaten with a small object with a square, straight edge. The object would have had a small surface area—smaller than a baseball bat or a hammer. The object would have had a handle to allow the user to gain enough momentum to create the force that fractured her skull.

*The Crime Scene Investigation*

Investigators noticed several oddities in the crime scene that led them to conclude Tuyet's murderer attempted to stage a robbery scene.

Detective A. Barr, who investigated the crime scene, noted there was no damage to the front door of the salon and no signs of forced entry. Although there were shelves with flowers and cosmetics just inside the front door, nothing appeared to be out of place. Around the cash register, near the front door, office items and magazines on the counter did not appear to be disturbed in any way. There was no blood around the cash register. Detective Barr opined that if a robber attacked Tuyet then emptied the cash register, there likely would have been blood around the cash register.

Down the hallway, in the classroom, he found a pocketbook with credit cards inside, lying on a table. Nothing else in the classroom appeared to have been disturbed. Almost nothing in the salon appeared to be out of order until Barr reached the back room, where Tuyet's body was found, about 100 feet away from the salon's entrance. Tuyet had cash in her back pocket. At the bottom of the trash can in the restroom were Tuyet's two cell phones, smashed beyond repair. Detective Barr noted that each of these things—credit cards, cash, cell phones—typically would have been taken in a robbery.

Detective W. Gilbert, the homicide detective who investigated this case, testified that robbers and burglars predominantly use guns, not blunt objects as in this case. He described Tuyet's injuries—repeated strikes to the face and head from close proximity—as "personal in nature[,] rather than a stranger committing a

11

robbery." He also noted that there was a span of about 30 minutes in between the two surveillance recordings of a woman screaming, but usually, a robber tries to get in and out of a location as quickly as possible.

<em>The Life Insurance Lawsuit</em>

After Tuyet's death, Trang attempted to collect the proceeds of her life insurance policy. The life insurer began an investigation because Trang would not have been eligible to collect the life insurance proceeds if he were responsible for Tuyet's death; instead, the proceeds would go to their children. An attorney, Megan Moore, was appointed to represent the children's interest in the related civil lawsuit. Megan took Trang's deposition in 2018 in connection with his claim for the life insurance proceeds. In this deposition, Trang gave many inconsistent statements that contradicted what he had previously told the police or what other witnesses would later testify to at trial. He claimed he never fought with Tuyet. He said that, after his meeting with Tequelia Armstrong, the CPS caseworker, he "felt good, normal," and denied that he got upset and yelled. He said he did not see Tuyet lock the door to the salon on the night she was murdered.

Contrary to his police statement, Trang said that he left Tuyet alone in the salon that night. When asked why he would leave Tuyet alone in the store when he was concerned enough to get the gun from his car after seeing the strange man enter the store, Trang answered:

12

> [T]here were two reasons. Reason number one, I made a mistake, I left there to close the business—when we thought that there was going to be the black guys come back and rob, that's one mistake I did. . . . Another reason is that I was going to get her flower—another gift, I want to buy some flowers for her again.

Trang claimed that when he left the salon, he drove to a store, though he could not remember which one, to buy flowers for Tuyet but then changed his mind and drove home. Trang did not mention buying flowers in his police statement and had told the police that he and Tuyet left the salon at the same time, and he drove home.

In this deposition, when recalling the night of Tuyet's murder, Trang said "I had an axe in my car." He said he carried a small hand axe and a gun in his car, but he volunteered that he lost the hand axe. He could not remember what he did with it.

Based on information collected from police investigations and the investigation for this life insurance lawsuit, a grand jury indicted Trang for Tuyet's murder. Following a jury trial, the jury convicted Trang, and the trial court assessed his punishment at 55 years' imprisonment. Trang now appeals.

## DISCUSSION

In three issues, Trang challenges his conviction. He argues the evidence presented at trial was insufficient to identify him as Tuyet's murderer, the trial court submitted an incorrect alternative theory in the jury charge that allowed the jury to

13

convict him based on a theory the evidence did not support, and the trial court erred in conducting a retrial after his first trial ended in a mistrial.

## A. Sufficiency of the Evidence

### *Applicable Law*

To evaluate the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution and ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In evaluating the sufficiency of the evidence, we may not intrude on the jury's role "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (quoting *Jackson*, 443 U.S. at 319). We may not sit as the thirteenth juror and make our own assessment of the evidence. *Id.*

The law does not require any particular type of evidence; direct and circumstantial evidence are equally probative. *Id.*; *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018). The jury alone weighs the evidence and may find guilt based only on circumstantial evidence, without any physical evidence linking the accused to the crime. *Nisbett*, 552 S.W.3d at 262; *Bradley v. State*, 359 S.W.3d 912, 917 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). "Each fact need not point

directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction." *Nisbett*, 552 S.W.3d at 262.

Not only must the State prove each element of the crime, it must also prove, beyond a reasonable doubt, that the accused was the person who committed the crime. *Phillips v. State*, 534 S.W.3d 644, 651 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *see also Johnson v. State*, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984). The State does not need to present eyewitness testimony; the State may prove the identity of the accused by direct or circumstantial evidence or by reasonable inferences drawn from the evidence. *Phillips*, 534 S.W.3d at 651; *Jones v. State*, 458 S.W.3d 625, 630 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd); *Greene v. State*, 124 S.W.3d 789, 792 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

### *Analysis*

Trang argues the evidence was insufficient to support his conviction because the evidence failed to identify him as the person who committed the crime. He argues there were impermissible gaps in the State's evidence, like the absence of physical evidence connecting him to the crime, the fact that the murder weapon was never found, and the lack of evidence to disprove his alibi. He argues the State presented little more than evidence of Trang's and Tuyet's troubled relationship, and there was not enough evidence to show a cause for his supposed anger on the day of Tuyet's murder. However, we conclude the circumstantial evidence presented in this case

15

and the reasonable inferences drawn from it are more than sufficient to establish Trang's identity as the person who committed the crime.

*Motive*

The jury heard evidence explaining Trang's motive. Motive alone is not sufficient to establish guilt, but it is a significant circumstance indicating guilt. *Nisbett*, 552 S.W.3d at 265. "Marital difficulty can establish a motive for murder." *Id.* Trang and Tuyet were getting a divorce. Tuyet was planning to cut Trang out of their salon business. Trang cared a lot about their children's academic progress and became angry and hostile when he learned the children were going to be placed with Tuyet, whom he did not think could adequately oversee their progress. He said that he would rather the children be placed in foster care than with Tuyet. Evidence of a troubled or abusive relationship can also be relevant in establishing guilt, not to prove character but to show motive or intent. *See id.*; TEX. R. EVID. 404(b). Trang had physically abused Tuyet in the past, and he admitted that he had trouble controlling his temper.

*Opportunity*

The jury also heard evidence that Trang had the opportunity to murder Tuyet. Opportunity is another circumstance indicating guilt. *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012). Trang was the last person seen with Tuyet at the salon before she was murdered. Trang later admitted that he used to carry a small

16

hand axe in his car, which was consistent with the medical examiner's testimony about the murder weapon.

*Suspicious Behavior and Inconsistent Statements*

After Tuyet's murder, Trang acted suspiciously and gave inconsistent statements to the police. Inconsistent statements and implausible explanations to the police are probative of wrongful conduct and circumstances of guilt. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). On the morning after Tuyet's murder, Trang told the police that he had seen Tuyet lock the door and leave the salon the night before. Yet the salon door was found unlocked in the morning, and there was no sign of forced entry. Trang also told the police at first that Tuyet had spent the night at Cindy's house, yet Cindy had called him the night before and told him that Tuyet never came home. Later that same day, he told the police Tuyet must have spent the night at Anna's house, but Anna had called Trang that morning asking where Tuyet was.

Trang also gave inconsistent statements about Tuyet's location to her friends. Tina called Trang the night of the murder looking for Tuyet, and he insisted Tuyet was not at the store and might be with Cindy. When Cindy called Trang looking for Tuyet, he told her Tuyet might be with Tina, even though he knew Tina could not find Tuyet earlier.

17

Trang looked for help teaching the follow-up class the day after Tuyet's murder, as if he knew Tuyet would not be coming to the salon. Trang called Kelvin late on the night of Tuyet's murder and asked Kelvin and Lucy to come to the salon in the morning, even though he never called Kelvin to discuss business and Kelvin and Lucy never taught the follow-up class. When Anna called Trang the following morning because she could not find Tuyet, Trang assured her that Lucy was coming to help with the class, rather than Tuyet, who always taught the follow-up class.

Years after Tuyet's murder, in his deposition that was part of the proceeding to collect Tuyet's life insurance policy, Trang gave several inconsistent and suspicious statements. He said he did not become angry in his meeting with Tequelia, the CPS caseworker, but she had testified that Trang became hostile, paced the floor, and yelled after she told him the children would probably be placed with Tuyet. Trang also said that he and Tuyet never fought, but several witnesses testified to his punching and choking Tuyet. Finally, he explained that he left Tuyet alone at the salon on the night of her murder, which was inconsistent with what he had originally told the police—he at first said they left the salon at the same time. Trang explained in the deposition that he made a mistake leaving Tuyet at the salon by herself after they had seen the stranger come into the store and he was scared enough to get the gun from his car. Trang also said—for the first time in the deposition—that he left Tuyet at the salon alone that night so he could buy her flowers. He had

18

never mentioned going to buy flowers when he gave his statement to the police and said that he went home after leaving the salon. Trang argues there was no evidence presented to disprove his alibi, but his inconsistent statements about where he went after he left the salon are circumstances of guilt. *See id.*

All of the evidence discussed thus far is circumstantial. But in *Nisbett v. State*, in two consolidated cases with similar facts and a similar lack of direct, physical evidence, the Court of Criminal Appeals held the circumstantial evidence was sufficient to support the defendants' murder convictions. *See Nisbett*, 552 S.W.3d at 268. In both unrelated cases that were consolidated for appeal, the defendants' wives disappeared and were never heard from again. *Id.* at 262. Both defendants had troubled relationships with their wives and were getting a divorce. *Id.* at 247, 252. Both defendants had a history of abusive and violent behavior toward their wives, *id.* at 263, and the victims were "extremely fearful" of the defendants, *id.* at 266. Both defendants were the last known person to see the victim alive. *Id.* Both defendants made suspicious statements and engaged in other suspicious behavior after their wives' disappearances. *Id.* Even though, in both cases, there were no eyewitnesses to the murders, no confessions by the defendants, and no murder weapons found, the Court concluded the circumstantial evidence showed the defendants' motive, opportunity, and sufficient connection to the wives' murders,

and therefore there was sufficient evidence to support both murder convictions. *Id.* at 262, 265–68.

Similarly, in this case, there is a lack of direct, physical evidence. There were no eyewitnesses, and the surveillance videos did not establish the murderer's identity. Trang never confessed. No murder weapon was found. But the circumstantial evidence—Trang's and Tuyet's troubled relationship and pending divorce, Trang's history of violent and abusive behavior toward Tuyet, Trang's being the last known person to see Tuyet alive, and Trang's suspicious behavior and inconsistent statements after Tuyet's murder—all support the jury's finding of guilt. *See id.*

*Staged Robbery*

Additionally, the jury heard evidence that the robbery at the salon was staged. Evidence that a robbery is staged can support a defendant's conviction even where direct, physical evidence is lacking. *See Temple v. State*, 390 S.W.3d 341, 360–63 (Tex. Crim. App. 2013) (holding that evidence of staged robbery, along with other circumstantial evidence—defendant's marital unhappiness, his opportunity to commit his wife's murder, and his inconsistent statements afterward—all provided sufficient evidence to support defendant's murder conviction); *Melgar v. State*, 593 S.W.3d 913, 920–22 (Tex. App.—Houston [14th Dist.] 2020, pet. dism'd) (holding evidence of staged robbery, along with other circumstantial evidence—defendant's

20

opportunity and physical capability to commit her husband's murder, and her suspicious behavior and inconsistent statements afterward—all provided sufficient evidence to support defendant's murder conviction).

There was no sign of forced entry at the salon, even though Trang initially testified that he saw Tuyet lock the door as she was leaving.

The drawer of the cash register was strewn on the floor and emptied, but almost nothing else around it was out of place. There was no blood or sign of a struggle around the cash register. Tuyet was found in the back room of the salon, far from the cash register. The cash register was just inside the front door and only entrance to the salon, but the back room was at the end of a long hallway, about 100 feet from the cash register. The lack of signs of struggle around the cash register suggest Tuyet did not try to fight off the robber; the jury could have inferred it was implausible for a robber to empty the cash drawer next to the front door, then go looking for witnesses in the back of the salon. The jury could have inferred it was equally implausible for a robber to ignore the cash drawer at the front of the salon and walk straight to the back of the salon to look for witnesses.

Tuyet's two cell phones were not stolen but found smashed and hidden in a trash can. Her wallet was left on a table; she had cash in her back pocket. The crime scene investigator testified that these items typically would be taken in a robbery.

Detective Gilbert, the homicide detective, testified that robbers and burglars predominantly use guns, not blunt objects as in this case. He described Tuyet's injuries—repeated strikes to the face and head from close proximity—as "personal in nature[,] rather than a stranger committing a robbery." He also noted that there was a span of about 30 minutes in between the two surveillance recordings of a woman screaming, but usually, a robber tries to get in and out of a location as quickly as possible.

Kelvin, Lucy, and Anna each testified to a strange man entering the store at some point on the day of Tuyet's murder. None of them described being scared, and none of them mentioned that Trang went to his car to get his gun after that happened. Kelvin and Lucy said they never saw Trang with a gun that day. Yet Trang told the police the man was "crazy" and that everyone in the store was scared. The jury could have inferred Trang embellished this story to cast suspicion on the strange man and corroborate the theory of a robbery.

The person who took Tuyet's car had the keys and left them in the ignition yet smashed the driver's side window *after* driving the car. The glove compartment was left open, but the boxes in the back of the car were untouched. The person who took Tuyet's car abandoned it only half a mile away from the salon. Even though that person was only in the car for about four minutes, that person managed to find the LoJack device under the seat. Detective Gilbert said there were more than 20 places

inside a car where a LoJack device could be installed, and likely no one other than the owner would know where it had been installed, so it was strange for someone other than the owner to find the LoJack device in about four minutes.

Trang argues that the surveillance video of a person flashing the lights and getting into Tuyet's car is speculative and inconclusive. We agree that the video itself does not establish the identity of Tuyet's murderer. But the suspicious circumstances surrounding the stealing of the car, which suggested someone only intended to stage its stealing rather than actually flee the crime scene, together with the other evidence that the salon's robbery was staged, all point to the conclusion that a mysterious robber did not murder Tuyet. *See Nisbett*, 552 S.W.3d at 262 (stating each fact need not independently point to guilt if cumulative force of all incriminating circumstances is sufficient to support conviction).

Trang is correct that in this case, there is a lack of direct, physical evidence connecting him to Tuyet's murder. But the jury is responsible for weighing the evidence presented and may find guilt without physical evidence linking the accused to the crime. *Id.*; *Bradley*, 359 S.W.3d at 917.

The cumulative force of the circumstantial evidence presented is strong. *See Nisbett*, 552 S.W. 3d at 262. Trang had the motive and opportunity to murder Tuyet. *See id.* at 265. He admitted to owning, but misplacing, a weapon consistent with the murder weapon. He behaved suspiciously after Tuyet's murder and gave

inconsistent statements to her friends and the police. *See id.* at 263, 266; *Guevara*, 152 S.W.3d at 50. Lastly, although there was some evidence the salon had been robbed, stronger evidence indicated the murderer staged the robbery. *See Temple*, 390 S.W.3d at 360–63; *Melgar*, 593 S.W.3d at 920–22.

We conclude a rational jury could have found Trang guilty of Tuyet's murder beyond a reasonable doubt. Therefore, the evidence is sufficient to support his conviction. We overrule Trang's first issue.

## B. Jury-Charge Error

### *Applicable Law*

We review claims of jury-charge error under a two-prong test. *Campbell v. State*, 664 S.W.3d 240, 245 (Tex. Crim. App. 2022). First, we must determine if there was error in the jury charge. *Id.* If there was error, then we conduct a harm analysis to determine if the error warrants reversing the conviction. *See id.*

The trial court must deliver to the jury a "written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. art. 36.14; *Burnett v. State*, 541 S.W.3d 77, 84 (Tex. Crim. App. 2017). Generally, the charge must conform to the allegations in the indictment, but the charge may not simply restate those allegations. *See Sanchez v. State*, 376 S.W.3d 767, 773 (Tex. Crim. App. 2012); *Gray v. State*, 152 S.W.3d 125, 127 (Tex. Crim. App. 2004). Instead, the trial court must apply the law to the facts of the case and tailor the charge to the facts presented

at trial. *Burnett*, 541 S.W.3d at 84. The charge may only include theories that are supported by the evidence. *See id.* When alternate theories are included, the jury does not need to unanimously agree on the manner or means, only that the defendant committed the crime. *See Sanchez*, 376 S.W.3d at 773–74.

Section 19.02 of the Penal Code describes three acts that constitute murder, two of which are relevant here. A person commits the offense of murder if the person: (1) "intentionally or knowingly causes the death of an individual"; or (2) "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(1), (2). "Serious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death," among other things. *Id.* § 1.07(a)(46). Trang's indictment alleged both types of murder.

Both types of murder require an action that causes the death of the individual and proof of the actor's culpable mental state. A jury generally must infer an actor's culpable mental state from the circumstances. *Nisbett*, 552 S.W.3d at 267. The jury may infer the defendant's culpable mental state from the defendant's motive, the extent of the victim's injuries, the method of committing the crime, and the defendant's acts, words, and conduct. *Id.*; *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

*Analysis*

Trang argues there was error in the jury charge that allowed the jury to convict him on a theory not supported by the evidence. He concedes the evidence in this case—if the jury considered it credible and reliable, which the jury evidently did—could establish his guilt under Subsection (b)(1) of Section 19.02 for knowingly or intentionally causing Tuyet's death. But he argues there was no evidence at trial that he *only* intended to cause serious bodily injury, so the trial court should not have submitted an instruction under Subsection (b)(2) for intending to cause serious bodily injury and committing an act clearly dangerous to human life.

Trang's argument presumes that an intent to cause death and an intent to cause serious bodily injury are mutually exclusive. They are not. Evidence that supports an inference that a defendant intended to cause death can also support an inference that a defendant intended to cause serious bodily harm. The Fourteenth Court of Appeals decided in *Cannon v. State* that proof of the elements of Subsection (b)(1) can also provide proof of the elements of Subsection (b)(2). 401 S.W.3d 907, 911 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

In that case, the defendant shot two people and was convicted of murder. *Id.* at 909. On appeal, he argued the trial court erred in giving the jury an instruction under Subsection (b)(2) because that subsection required different elements than

Subsection (b)(1).[2] *Id.* The court reasoned that "proof that a person intentionally and knowingly caused the death of [an individual], would also prove that the person intended to cause serious bodily injury of [that] person." *Id.* at 911. The court noted that "serious bodily injury" includes an injury "that causes death." *Id.* (quoting TEX. PENAL CODE § 1.07(a)(46)). "Death," the court explained, is "essentially[] the most serious bodily injury." *Id.*

The court also reasoned that proof of a deadly act—in that case, shooting someone with a firearm—also proved the defendant committed an act clearly dangerous to human life. *Id.* Therefore, in *Cannon*, proof that established the defendant's guilt under Subsection (b)(1) could also establish the defendant's guilt under Subsection (b)(2). *See id.*

The same reasoning applies in this case. Trang concedes the evidence proves he intentionally or knowingly caused Tuyet's death. The same evidence, then, also proves he intended to cause her serious bodily injury. The evidence presented at trial

---

[2]    Cannon was tried for capital murder for causing the deaths of two people, which requires proof of the elements of Section 19.02(b)(1) and proof of the murder of more than one person. *Cannon*, 401 S.W.3d at 909; *see also* TEX. PENAL CODE § 19.03(a)(7)(A). The jury found Cannon guilty of only one murder. *Cannon*, 401 S.W.3d at 909. The question on appeal was whether murder under Section 19.02(b)(2) was a lesser included offense under the capital murder statute, which only expressly incorporates the elements of Section 19.02(b)(1), not Section 19.02(b)(2). *See id.* Reduced to its essentials, then, the question on appeal was whether the elements of Section 19.02(b)(2) could be established by proof of the same or less than all the facts required to prove the elements of Section 19.02(b)(1). The Fourteenth Court of Appeals decided that they could. *See id.* at 911.

27

showed Tuyet's murderer struck her a total of 13 times, six times directly to her head, with a small object with square, straight edge and a handle, which the jury could reasonably have inferred was a small hand axe. Striking Tuyet multiple times in the head with a hand axe shows an intent to cause serious bodily injury, which includes "bodily injury that . . . causes death." *See* TEX. PENAL CODE § 1.07(a)(46); *Nisbett*, 552 S.W.3d at 267; *Hart*, 89 S.W.3d at 64. Similarly, the same action constitutes an "act clearly dangerous to human life." *See* TEX. PENAL CODE § 19.02(b)(2). Striking Tuyet multiple times in the head with a hand axe evidently was an act clearly dangerous to human life, as it caused her death.

Therefore, the jury was presented with evidence supporting a conviction not only under Section 19.02(b)(1), but also under Section 19.02(b)(2). The trial court did not err in instructing the jury on the two alternate theories of murder. Having found no error, we need not proceed to a harm analysis. *Cf. Campbell*, 664 S.W.3d at 245 (stating if there was error in jury charge, then reviewing court conducts harm analysis). We overrule Trang's second issue.

## C.     Double Jeopardy

### *Applicable Law*

The double-jeopardy clause of the Fifth Amendment to the United States Constitution protects a defendant from repeated prosecutions for the same offense. U.S. CONST. amend. V; *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982). When a trial

28

court grants a mistrial over the defendant's objection, the double-jeopardy clause bars any retrial unless the State proves a "manifest necessity" for the mistrial. *See Arizona v. Washington*, 434 U.S. 497, 505 (1978). However, when a *defendant* moves for a mistrial, generally the double-jeopardy clause does not bar a retrial. *See Kennedy*, 456 U.S. at 673. The manifest-necessity standard "has no place" in the analysis when a defendant successfully moves for a mistrial. *See id.* at 672. There is one narrow exception to the general rule: double jeopardy bars a retrial, even if the defendant moved for a mistrial, if the prosecutor's misconduct is intended to "goad" the defendant into moving for a mistrial. *See id.* at 676.

### *Analysis*

Here, Trang acknowledges that he moved for a mistrial. Therefore, although Trang argues the trial court erred by granting a mistrial without first finding a manifest necessity, that is not the correct standard. Because Trang moved for a mistrial, the double-jeopardy clause does not bar a retrial. *See id.* at 673 (stating that generally double-jeopardy clause does not bar retrial when defendant moves for mistrial). The manifest-necessity standard "has no place" in the analysis here. *See id.* at 672. Trang concedes in his appellate brief that the narrow exception does not apply: the prosecutor did not goad him into moving for a mistrial. *See id.* at 676.

Instead, Trang argues he was forced to move for a mistrial without his "effective consent." For this argument, he relies on *Bond v. State*, in which this court

considered the defendant's argument that he did not effectively consent to a mistrial because he was not represented by counsel when he requested a mistrial. 176 S.W.3d 397, 400 (Tex. App.—Houston [1st Dist.] 2004, no pet.). The record in that case showed, however, that the defendant was represented by counsel and that counsel advised the defendant of the consequences of requesting a mistrial. *Id.* at 401. This court then affirmed the trial court's denial of defendant's request for habeas relief. *Id.* at 401–02. *Bond* did not create different standards for a defendant's consent and a defendant's "effective consent," nor does it affect our analysis here.

Trang moved for a mistrial, so the double-jeopardy clause did not bar his retrial, and he concedes the narrow exception to that general rule does not apply here. *See Kennedy*, 456 U.S. at 673, 676. We therefore overrule Trang's third issue.

## CONCLUSION

We affirm the trial court's judgment.

Gordon Goodman
Justice

Panel consists of Justices Goodman, Landau, and Hightower.

Do not publish. TEX. R. APP. P. 47.2(b).